Robert V. Prongay (SBN 270796)
 rprongay@glancylaw.com
Charles H. Linehan (SBN 307439)
 clinehan@glancylaw.com
GLANCY PRONGAY WOLKE & ROTTER LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Cory Burnell*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORY BURNELL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BLACKROCK TCP CAPITAL CORP., RAJ VIG, PHIL TSENG, and ERIK L. CUELLAR,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Cory Burnell ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by BlackRock TCP Capital Corp. ("BlackRock TCP" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by BlackRock TCP; and (c) review of other publicly available information concerning BlackRock TCP.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired BlackRock TCP securities between November 6, 2024 and January 23, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      BlackRock TCP is a business development company which raises funds from investors and then use those funds to make loans to small and midsize businesses as an alternative to bank financing. BlackRock TCP then seeks to generate returns through a combination of contractual interest payments on its debt investments, origination and similar fees, and, to a lesser extent, equity appreciation. The Company's typical investments are in middle-market companies, which it generally defines as those with enterprise values between $100 million and $1.5 billion.

3.      Investors in BlackRock TCP rely on key financial metrics like "net asset value" in quarterly reports provided by the Company in order to gauge the health of the Company, and whether or not they want to buy or sell shares. Net asset value directly impacts the trading price of the Company's shares, its ability to raise capital, and compliance with regulatory requirements.

4.    Net asset value (or "NAV") refers to the value of the Company's underlying assets, minus their total liabilities. Otherwise stated, the net asset value is roughly equal to the estimated value of the underlying assets of the Company, if the Company were to sell those assets and pay off its liabilities. Calculating net asset value therefore depends on the Company making an estimate of the fair value of their assets. Throughout the Class Period, the Company alleged that "[a]ll investments are valued at least quarterly" with the exception of certain investments which comprised less than 5% of the assets of the Company.

5.    Prior to the start of the Class Period, the Company's NAV per share was $11.90 as of December 31, 2023.

6.    On February 27, 2025, before the market opened, Company issued a press release announcing financial results for the fourth quarter and year ended December 31, 2024. The press release disclosed that the Company's portfolio had significantly weakened during the 2024 fiscal year. Specifically, the press release revealed the number of portfolio companies on non-accrual status had more than doubled, and as a result, ***debt investments on non-accrual status at cost increased by 289%*** (from 3.7% to 14.4% of the portfolio). Moreover, the press release revealed that the Company's ***NAV had fallen 22.44%*** year over year to $9.23 per share.[1] Total losses, both realized and unrealized, were revealed to have ballooned to $194,895,042 for the fiscal year, a ***186% increase*** year over year, in large part due to a newly added $72.3 million net unrealized loss within the fourth quarter. Despite this, the press release alleged the NAV of the Company was accurate at $9.23 per share, and that "***the vast majority of [the Company's] portfolio continued to perform well***," and the Company was " working closely with [its] borrowers and sponsors to resolve the portfolio issues."

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

7.    On this news, the Company's stock price fell $0.90, or 9.64%, to close at $8.44 per share on February 27, 2025, on unusually heavy trading volume.

8.    On January 23, 2026, after market hours, BlackRock TCP disclosed certain fourth quarter and full year 2025 financial results, including that the Company's NAV per share as of December 31, 2025 was, in fact in the range of $7.05 to $7.09, **19% less than reported the prior quarter** and **23.4% less than reported the prior year.**

9.    On this news, BlackRock TCP's stock price fell $0.76, or 12.97%, to close at $5.10 per share on January 26, 2026, on unusually heavy trading volume.

10.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company's investments were not being timely and/or appropriately valued; (2) the Company's efforts at portfolio restructuring were not effectively resolving challenged credits or improving the quality of the portfolio; (3) as a result, the Company's unrealized losses were understated; (4) as a result, the Company's NAV was overstated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Plaintiff Cory Burnell, as set forth in the accompanying certification, incorporated by reference herein, purchased BlackRock TCP securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant BlackRock TCP is incorporated under the laws of Delaware with its principal executive offices located in Santa Monica, California. BlackRock TCP's common stock trades on the NASDAQ stock market under the symbol "TCPC."

18.     Defendant Raj Vig ("Vig") was the Company's Chief Executive Officer ("CEO") from August 5, 2021, until the close of business on November 6, 2024.

19.     Defendant Phil Tseng ("Tseng") has been the Company's CEO since November 7, 2024.

20.     Defendant Erik L. Cuellar ("Cuellar") was the Company's Chief Financial Officer ("CFO") at all relevant times.

21.     Defendants Vig, Tseng, and Cuellar (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and

authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     BlackRock TCP is a Business Development Company ("BDC"). A BDC raises funds from investors and then use those funds to make loans to small and midsize businesses as an alternative to bank financing. The BDC then seeks to generate returns through a combination of contractual interest payments on its debt investments, origination and similar fees, and, to a lesser extent, equity appreciation. The Company's typical investments are in middle-market companies, which it generally defines as those with enterprise values between $100 million and $1.5 billion.

23.     Investors in BlackRock TCP rely on key financial metrics like Net Asset Value (NAV) in quarterly reports provided by the Company in order to gauge the health of the Company, and whether or not they want to buy or sell shares. NAV refers to the value of the Company's underlying assets, minus their total liabilities. Otherwise stated, the NAV is roughly equal to the estimated value of the underlying assets the Company, if the Company were to sell those assets and pay off its liabilities.

Calculating NAV therefore depends on the Company making an estimate of the fair value of their assets.

24.    NAV directly impacts the trading price of the Company's shares, its ability to raise capital, and compliance with regulatory requirements. Prior to the start of the Class Period, the Company's NAV per share was $11.90 per share as of December 31, 2023.

25.    Throughout the Class Period, the Company alleged that "[a]ll investments are valued at least quarterly" with the exception of investments priced directly by the Company's "Valuation Designee" which in the aggregate comprised less than 5% of the assets of the Company.

26.    A valuation designee is an investment advisor which the Company appointed to determine the fair value of its investments in accordance with documented valuation policies and procedures approved by the Board.[2] BlackRock TCP's valuation designee is Tennenbaum Capital Partners, LLC, which is an indirect subsidiary of BlackRock, Inc. While BDC may designate their investment adviser or officers to perform day-to-day fair value determinations, the Company and its Board of Directors retains ultimate responsibility and liability for the fair value of the portfolio.

**Materially False and Misleading**

**Statements Issued During the Class Period**

27.    The Class Period begins on November 6, 2024.  On that day, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2024. The press release touted the Company's alleged financial results, including its alleged NAV and debt investments on non-accrual status. The press release further purported to reassure investors that the Company "showed signs

---

[2] In accordance with SEC Rule 2a-5, adopted pursuant to the Investment Company Act of 1940, Section 2(a).

of improvement since last quarter as non-accrual investments declined" and that while an "additional non-accrual investment and certain markdowns resulted in a slight reduction in the NAV" the Company was "working diligently with our borrowers, their lenders, and their sponsors to resolve credit issues." Specifically, the press release stated as follows, in relevant part:

• ***Net asset value per share was $10.11 as of September 30, 2024 compared to $10.20 as of June 30, 2024.***

• ***Net increase in net assets from operations on a GAAP basis for the quarter ended September 30, 2024 was $21.6 million, or $0.25 per share***, compared to a $51.3 million, or $0.60 per share, net decrease in net assets from operations for the quarter ended June 30, 2024.

\*                    \*                    \*

• As of September 30, 2024, ***debt investments on non-accrual status represented 3.8% of the portfolio at fair value and 9.3% at cost***, compared to 4.9% of the portfolio at fair value and 10.5% at cost as of June 30, 2024.

\*                    \*                    \*

"Our portfolio showed signs of improvement since last quarter as non-accrual investments declined; however, an additional non-accrual investment and certain markdowns resulted in a slight reduction in the NAV. We are working diligently with our borrowers, their lenders, and their sponsors to resolve credit issues with the goal of achieving positive outcomes for our shareholders."

"At quarter end, our portfolio remained well diversified with 156 investments primarily in senior secured, first-lien loans. We have a strong capital and liquidity position to capitalize on a growing pipeline of attractive investment opportunities to deliver attractive risk-adjusted returns for our shareholders over the long term."

\*                    \*                    \*

| | Three months ended September 30, | | | |
| | 2024 | | 2023 | |
| | Amount | Per Share | Amount | Per Share |
|---|---|---|---|---|
| **Net investment income** | $ 33,877,641 | 0.40 | $ 28,319,912 | 0.49 |
| Less: Purchase accounting discount amortization | 3,044,864 | 0.04 | — | — |
| **Adjusted net investment income** | $ 30,832,777 | 0.36 | $ 28,319,912 | 0.49 |
| | | | | |
| **Net realized and unrealized gain (loss)** | $ (12,244,681) | (0.14) | $ (15,496,980) | (0.27) |
| Less: Realized gain (loss) due to the allocation of purchase discount | 2,727,500 | 0.03 | — | — |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | (5,772,364) | (0.07) | — | — |
| **Adjusted net realized and unrealized gain (loss)** | $ (9,199,817) | (0.10) | $ (15,496,980) | (0.27) |
| | | | | |
| **Net increase (decrease) in net assets resulting from operations** | $ 21,632,960 | 0.25 | $ 12,822,932 | 0.22 |
| Less: Purchase accounting discount amortization | 3,044,864 | 0.04 | — | — |
| Less: Realized gain (loss) due to the allocation of purchase discount | 2,727,500 | 0.03 | — | — |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | (5,772,364) | (0.07) | — | — |
| **Adjusted net increase (decrease) in assets resulting from operations** | $ 21,632,960 | 0.25 | $ 12,822,932 | 0.22 |

28.     On November 6, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report also provided additional alleged details of the Company's per share NAV financial results, and purported to assure investors that "[a]ll investments are valued at least quarterly [] with the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company." Specifically, the quarterly report stated as follows, in relevant part:

Investments are recorded at fair value in accordance with GAAP, based upon the principles and methods of valuation set forth in the policies adopted by the Valuation Designee and approved by the Board of Directors. Fair value is generally defined as the amount for which an investment would be sold in an orderly transaction between market participants at the measurement date.

***All investments are valued at least quarterly based on quotations or other affirmative pricing from independent third-party sources, with the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company.*** Investments listed on a recognized exchange or market quotation system, whether U.S. or foreign, are valued using the closing price on the date of valuation. Investments not listed on a recognized

exchange or market quotation system, but for which reliable market quotations are readily available are valued using prices provided by a nationally recognized pricing service or by using quotations from broker-dealers.

\*　　　　　　\*　　　　　　\*

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2024 | | 2023 | |
| Per Common Share | | | | |
| Per share NAV at beginning of period | $ | 11.90 | $ | 12.93 |
| | | | | |
| Investment operations: | | | | |
| Net investment income before excise taxes | | 1.26 | | 1.40 |
| Excise taxes | | — | | — |
| Net investment income [1] | | 1.26 | | 1.40 |
| Net realized and unrealized gain (loss) [1] | | (1.75) | | (0.51) |
| Total from investment operations | | (0.49) | | 0.89 |
| | | | | |
| Net decrease in net assets as a result of issuance of shares in connection with the Merger [2] | | (0.28) | | — |
| Dividends to common shareholders | | (1.02) | | (1.10) |
| | | | | |
| Per share NAV at end of period | $ | 10.11 | $ | 12.72 |
| | | | | |
| Per share market price at end of period | $ | 8.29 | $ | 11.74 |
| | | | | |
| Total return based on market value [3][4] | | (19.3)% | | (0.8)% |
| Total return based on net asset value [3][5] | | (6.5)% | | 6.9% |

29.    The above statements identified in ¶¶ 27-28 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) the Company's investments were not being timely and/or appropriately valued; (2) the Company's efforts at portfolio restructuring were not effectively resolving challenged credits or improving the quality of the portfolio; (3) as a result, the Company's unrealized losses were understated; (4) as a result, the Company's NAV was overstated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

30.    The truth partially emerged on February 27, 2025, before the market opened, when the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2024. The press release disclosed the Company's portfolio had significantly weakened during the 2024 fiscal year.

Specifically, the press release revealed the number of portfolio companies on non-accrual status had more than doubled, and as a result, ***debt investments on non-accrual status at cost increased by 289%*** (from 3.7% to 14.4% of the portfolio). Moreover, the press release revealed that the Company's net asset value had fallen to ***22.44%*** year over year to $9.23 from $11.90 per share in the same period the prior year. Total losses, both realized and unrealized, were revealed to have ballooned to $194,895,042 for the fiscal year, a ***186% increas****e* year over year. Despite this, the press release alleged the NAV of the Company was accurate at $9.23 per share, and that "***the vast majority of our portfolio continued to perform well***, we are working closely with our borrowers and sponsors to resolve the portfolio issues." Specifically, the press release stated as follows, in relevant part:

• ***Net asset value per share was $9.23*** as of December 31, 2024 compared to $10.11 as of September 30, 2024.

• ***Net decrease in net assets from operations on a GAAP basis for the quarter ended December 31, 2024 was $38.6 million,*** or $0.45 per share, compared to a $21.6 million, or $0.25 per share, net decrease in net assets from operations for the quarter ended September 30, 2024.

*            *            *

• ***As of December 31, 2024, debt investments on non-accrual status represented 5.6% of the portfolio at fair value and 14.4% at cost,*** compared to 3.8% of the portfolio at fair value and 9.3% at cost as of September 30, 2024.

*            *            *

["]***While the vast majority of our portfolio continued to perform well, we are working closely with our borrowers and sponsors to resolve the portfolio issues that impacted our results*** in recent quarters. TCPC's new management team remains optimistic about our future prospects and is confident we have the right plan in place to effectively navigate the challenges presented during 2024 and to return the portfolio performance to historical levels, said Phil Tseng, Chairman and CEO of BlackRock TCP Capital Corp.

\*                          \*                          \*

| | Year ended December 31, | | | | |
| | 2024 | | 2023 | | |
| | Amount | Per Share | Amount | Per Share |
|---|---|---|---|---|
| Net investment income | $ 131,757,870 | 1.65 | $ 106,556,758 | 1.84 |
| Less: Purchase accounting discount amortization | 10,303,754 | 0.13 | — | — |
| Adjusted net investment income | $ 121,454,116 | 1.52 | $ 106,556,758 | 1.84 |
| | | | | |
| Net realized and unrealized gain (loss) | $ (194,895,042) | (2.45) | $ (68,082,326) | (1.18) |
| Less: Realized gain (loss) due to the allocation of purchase discount | 9,798,978 | 0.12 | — | — |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | 1,784,116 | 0.02 | — | — |
| Adjusted net realized and unrealized gain (loss) | $ (206,478,136) | (2.59) | $ (68,082,326) | (1.18) |
| | | | | |
| Net increase (decrease) in net assets resulting from operations | $ (63,137,172) | (0.79) | $ 38,474,432 | 0.67 |
| Less: Purchase accounting discount amortization | 10,303,754 | 0.13 | — | — |
| Less: Realized gain (loss) due to the allocation of purchase discount | 9,798,978 | 0.12 | — | — |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | 1,784,116 | 0.02 | — | — |
| Adjusted net increase (decrease) in assets resulting from operations | $ (85,024,020) | (1.06) | $ 38,474,432 | 0.67 |

\*                          \*                          \*

Net unrealized losses for the three months ended December 31, 2024 primarily reflects a $50.3 million unrealized loss on our investment in Razor, a $7.3 million unrealized loss on our investment in Securus, a $6.5 million unrealized loss on our investment in Astra, a $4.9 million unrealized loss on our investment in Homerenew Buyer, a $4.1 million unrealized loss on our investment in Pluralsight, a $3.1 million unrealized loss on our investment in Fishbowl and a $3.0 million unrealized loss on our investment in InMoment, partially offset by a $14.8 million reversals of previous unrealized losses of our investment in SellerX. Net decrease in net assets resulting from operations for the three months ended December 31, 2024 was $38.6 million, or $0.45 per share.

31.   On this news, the Company's stock price fell $0.90, or 9.64%, to close at $8.44 per share on February 27, 2025, on unusually heavy trading volume.

32. On February 27, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY24 10-K affirmed the previously reported financial results. The FY24 10-K further reported details of the Company's per share NAV financial results as follows, in relevant part:

| | 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| **Per Common Share** | | | | | |
| Per share NAV at beginning of period | $ 11.90 | $ 12.93 | $ 14.36 | $ 13.24 | $ 13.21 |
| Investment operations: | | | | | |
| Net investment income before excise taxes | 1.66 | 1.85 | 1.53 | 1.26 | 1.43 |
| Excise taxes | 0.00 | (0.01) | — | — | — |
| Net investment income [(1)] | 1.66 | 1.84 | 1.53 | 1.26 | 1.43 |
| Net realized and unrealized gain (loss) [(1)] | (2.60) | (1.18) | (1.69) | 1.17 | (0.16) |
| Total from investment operations | (0.94) | 0.66 | (0.16) | 2.43 | 1.27 |
| Net decrease in net assets as a result of issuance of shares in connection with the Merger [(2)] | (0.28) | — | — | — | |
| Repurchase of common stock | 0.01 | — | — | — | 0.12 |
| Issuance of convertible debt | — | — | — | — | |
| Loss on extinguishment of debt | — | — | — | (0.11) | (0.04) |
| Cumulative effect adjustment for the adoption of ASU 2020-06 [(3)] | — | — | 0.00 | — | |
| Ordinary income dividends | (1.46) | (1.69) | (1.27) | (1.20) | (1.13) |
| Tax basis returns of capital | — | — | — | — | (0.19) |
| Dividends to common shareholders [(4)] | (1.46) | (1.69) | (1.27) | (1.20) | (1.32) |
| Per share NAV at end of period | $ 9.23 | $ 11.90 | $ 12.93 | $ 14.36 | $ 13.24 |
| Per share market price at end of period | $ 8.71 | $ 11.54 | $ 12.94 | $ 13.51 | $ 11.24 |
| Total return based on market value [(5)] | (11.9)% | 2.2% | 5.2% | 30.9% | (10.6)% |
| Total return based on net asset value [(6)] | (10.2)% | 5.1% | -1.1% | 17.5% | 10.2% |

33. The FY24 10-K purported to assure investors that "[a]ll investments are valued at least quarterly [] with the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company," as follows in relevant part:

Investments are recorded at fair value in accordance with GAAP, based upon the principles and methods of valuation set forth in the policies adopted by the Valuation Designee and approved by the Board of Directors. Fair value is generally defined as the amount for which an investment would be sold in an orderly transaction between market participants at the measurement date.

**All investments are valued at least quarterly based on quotations or other affirmative pricing from independent third-party sources, with**

*the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company.* Investments listed on a recognized exchange or market quotation system, whether U.S. or foreign, are valued using the closing price on the date of valuation. Investments not listed on a recognized exchange or market quotation system, but for which reliable market quotations are readily available are valued using prices provided by a nationally recognized pricing service or by using quotations from broker-dealers.

34. The FY24 10-K purported to warn of risk which "*could*" or "*may*" negatively impact the Company including that the Company's NAV "may" be overstated or that the Company "could" experience a severe declines in net asset value or an "inability of the Company to accurately or reliably value its portfolio." Specifically the FY24 10-K stated as follows, in relevant part:

*Because our investments are generally not in publicly traded securities, there will be uncertainty regarding the value of our investments, which could adversely affect the determination of our net asset value.*

\* \* \*

Because such valuations are inherently uncertain and may be based on estimates, our determinations of fair value may differ materially from the values that would be assessed if a readily available market for these securities existed. Due to this uncertainty, our fair value determinations with respect to any non-traded investments we hold may cause our net asset value on a given date to materially understate or overstate the value that we may ultimately realize on one or more of our investments. *As a result, investors purchasing our securities based on an overstated net asset value may pay a higher market price than the value of our investments might warrant.* Conversely, investors selling securities based on a net asset value that understates the value of our investments may receive a lower market price for their securities than the value of our investments might warrant.

\* \* \*

*Economic recessions or downturns could impair our portfolio companies and harm our operating results.*

Many of our portfolio companies may be susceptible to economic slowdowns or recessions and may be unable to repay our loans during these periods. Therefore, *our non-performing assets may increase and the value of our portfolio may decrease during these periods as we are required to record the values of our investments.* Adverse economic conditions also may decrease the value of collateral securing some of our loans and the value of our equity investments. Economic slowdowns or recessions could lead to financial losses in our portfolio and a decrease in revenues, net income and assets. Unfavorable economic conditions also could increase our funding costs, limit our access to the capital

markets or result in a decision by lenders not to extend credit to us. These events could prevent us from increasing investments and harm our operating results.

*                    *                    *

Inflationary pressures have been elevated in recent years, and there is a risk of the economy entering a recession.

Any such recession would negatively impact the businesses in which we invest and our business. These impacts may include:

- *severe declines in the market price of our securities or net asset value*;

- *inability of the Company to accurately or reliably value its portfolio*;

35.     On May 8, 2025, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2025. The press release touted the Company's alleged financial results, including its NAV. The press release further purported to reassure investors that the Company "made meaningful progress in strengthening our portfolio in the first quarter" and the Company was seeing "portfolio stabilization." Specifically, the press release stated as follows, in relevant part:

- *Net asset value per share was $9.18* as of March 31, 2025 compared to $9.23 as of December 31, 2024.

- *Net increase in net assets from operations on a GAAP basis for the quarter ended March 31, 2025 was $20.9 million,* or $0.25 per share, compared to a $38.6 million, or $0.45 per share, net decrease in net assets from operations for the quarter ended December 31, 2024.

*                    *                    *

"*We made meaningful progress in strengthening our portfolio in the first quarter, and we are pleased to see signs of portfolio stabilization.* Investments on non-accrual loans declined to 4.4% from 5.6% of the portfolio at fair value this quarter, reflecting the exit of four non-accrual investments. Adjusted net investment income and net asset value were stable with last quarter's levels at $0.36 per share and $9.18 per share, respectively," said Phil Tseng, Chairman, Co-CIO, and CEO of BlackRock TCP Capital Corp.

1                    *                    *                    *

| | Three months ended March 31, | | | | |
| | 2025 | | | 2024 | |
| | Amount | Per Share | | Amount | Per Share |
|---|---|---|---|---|---|
| Net investment income | $ 32,202,669 | 0.38 | $ | 28,261,273 | 0.46 |
| Less: Purchase accounting discount amortization | 1,502,373 | 0.02 | | 539,491 | 0.01 |
| Adjusted net investment income | $ 30,700,296 | 0.36 | $ | 27,721,782 | 0.45 |
| | | | | | |
| Net realized and unrealized gain (loss) | $ (11,308,081) | (0.13) | $ | (23,204,132) | (0.37) |
| Less: Realized gain (loss) due to the allocation of purchase discount | 2,685,479 | 0.03 | | — | — |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | (4,187,852) | (0.05) | | 21,347,357 | 0.34 |
| Adjusted net realized and unrealized gain (loss) | $ (9,805,708) | (0.11) | $ | (44,551,489) | (0.71) |
| | | | | | |
| Net increase (decrease) in net assets resulting from operations | $ 20,894,588 | 0.25 | $ | 5,057,141 | 0.08 |
| Less: Purchase accounting discount amortization | 1,502,373 | 0.02 | | 539,491 | 0.01 |
| Less: Realized gain (loss) due to the allocation of purchase discount | 2,685,479 | 0.03 | | — | — |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | (4,187,852) | (0.05) | | 21,347,357 | 0.34 |
| Adjusted net increase (decrease) in assets resulting from operations | $ 20,894,588 | 0.25 | $ | (16,829,707) | (0.27) |

36.    On May 8, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report also provided additional alleged details of the Company's per share NAV financial results, and purported to assure investors that "[a]ll investments are valued at least quarterly [] with the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company." Specifically, the quarterly report stated as follows, in relevant part:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2025 | 2024 |
| *Per Common Share* | | |
| Per share NAV at beginning of period | $    9.23 | $    11.90 |
| Investment operations: | | |
| Net investment income [1] | 0.38 | 0.45 |
| Net realized and unrealized gain (loss) [1] | (0.14) | (0.59) |
| Total from investment operations | 0.24 | (0.14) |
| Net decrease in net assets as a result of issuance of shares in connection with the Merger [2] | — | (0.28) |
| Repurchase of common stock | 0.00 | — |
| Dividends to common shareholders | (0.29) | (0.34) |
| Per share NAV at end of period | $    9.18 | $    11.14 |
| Per share market price at end of period | $    8.01 | $    10.43 |
| Total return based on market value [3] [4] | (4.7)% | (6.7)% |
| Total return based on net asset value [3] [5] | 2.6% | (3.6)% |

\*                    \*                    \*

Investments are recorded at fair value in accordance with GAAP, based upon the principles and methods of valuation set forth in the policies adopted by the Valuation Designee and approved by the Board of Directors. Fair value is generally defined as the amount for which an investment would be sold in an orderly transaction between market participants at the measurement date.

***All investments are valued at least quarterly based on quotations or other affirmative pricing from independent third-party sources, with the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company.*** Investments listed on a recognized exchange or market quotation system, whether U.S. or foreign, are valued using the closing price on the date of valuation. Investments not listed on a recognized exchange or market quotation system, but for which reliable market quotations are readily available are valued using prices provided by a nationally recognized pricing service or by using quotations from broker-dealers.

37.    On August 7, 2025, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2025. The press release touted the Company's alleged financial results, including its alleged NAV. The press release further purported to reassure investors that the Company "made solid progress in reducing non-accruals" and that "[w]hile net asset value declined, this was driven by

markdowns on previously restructured investments rather than new credit issues." Specifically, the press release stated as follows, in relevant part:

> • *Net asset value per share was $8.71 as of June 30, 2025* compared to $9.18 as of March 31, 2025, driven largely by markdowns on previously restructured portfolio companies.

> • *Net decrease in net assets from operations on a GAAP basis for the quarter ended June 30, 2025 was $15.9 million*, or $0.19 per share, compared to a $20.9 million, or $0.25 per share, net increase in net assets from operations for the quarter ended March 31, 2025.

> \*              \*              \*

> "*We made solid progress in reducing non-accruals,* which declined to 3.7% of the portfolio's fair market value in the second quarter, down from 4.4% last quarter and 5.6% at the end of 2024," said Phil Tseng, Chairman, Co-CIO, and CEO of BlackRock TCP Capital Corp. "*While net asset value declined, this was driven by markdowns on previously restructured investments rather than new credit issues*. We are actively engaged with these portfolio companies and focused on optimizing outcomes for our shareholders. At the same time, we continue to selectively deploy capital into attractive investment opportunities that align with our stated strategy and our objective of returning our portfolio to historical performance levels."

> \*              \*              \*

| | Three months ended June 30, | | | |
| | 2025 | | 2024 | |
| | Amount | Per Share | Amount | Per Share |
|---|---|---|---|---|
| **Net investment income** | $ 27,594,675 | 0.32 | $ 35,825,532 | 0.42 |
| Less: Purchase accounting discount amortization | 1,293,521 | 0.01 | 3,694,506 | 0.04 |
| **Adjusted net investment income** | $ 26,301,154 | 0.31 | $ 32,131,026 | 0.38 |
| | | | | |
| **Net realized and unrealized gain (loss)** | $ (43,501,259) | (0.51) | $ (87,102,049) | (1.02) |
| Less: Realized gain (loss) due to the allocation of purchase discount | 4,000,208 | 0.05 | 5,187,625 | 0.06 |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | (5,293,729) | (0.06) | (8,882,131) | (0.10) |
| **Adjusted net realized and unrealized gain (loss)** | $ (42,207,738) | (0.50) | $ (83,407,543) | (0.98) |
| | | | | |
| **Net increase (decrease) in net assets resulting from operations** | $ (15,906,584) | (0.19) | $ (51,276,517) | (0.60) |
| Less: Purchase accounting discount amortization | 1,293,521 | 0.01 | 3,694,506 | 0.04 |
| Less: Realized gain (loss) due to the allocation of purchase discount | 4,000,208 | 0.05 | 5,187,625 | 0.06 |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | (5,293,729) | (0.06) | (8,882,131) | (0.10) |
| **Adjusted net increase (decrease) in assets resulting from operations** | $ (15,906,584) | (0.19) | $ (51,276,517) | (0.60) |

38.     On August 7, 2025, the Company submitted its quarterly report for the period ended June 30, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report also provided additional alleged details of the Company's per share NAV financial results, and purported to assure investors that "[a]ll investments are valued at least quarterly [] with the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company." Specifically, the quarterly report stated as follows, in relevant part:

| | Six Months Ended June 30, | |
| | 2025 | 2024 |
|---|---|---|
| **Per Common Share** | | |
| Per share NAV at beginning of period | $            9.23 | $            11.90 |
| Investment operations: | | |
| Net investment income [1] | 0.70 | 0.87 |
| Net realized and unrealized gain (loss) [1] | (0.64) | (1.61) |
| Total from investment operations | 0.06 | (0.74) |
| Net decrease in net assets as a result of issuance of shares in connection with the Merger [2] | — | (0.28) |
| Repurchase of common stock | 0.00 | — |
| Dividends to common shareholders | (0.58) | (0.68) |
| Per share NAV at end of period | $            8.71 | $            10.20 |
| Per share market price at end of period | $            7.70 | $            10.80 |
| Total return based on market value [3] [4] | (4.9)% | (0.5)% |
| Total return based on net asset value [3] [5] | 0.7% | (8.6)% |

*                    *                    *

Investments are recorded at fair value in accordance with GAAP, based upon the principles and methods of valuation set forth in the policies adopted by the Valuation Designee and approved by the Board of Directors. Fair value is generally defined as the amount for which an investment would be sold in an orderly transaction between market participants at the measurement date.

***All investments are valued at least quarterly based on quotations or other affirmative pricing from independent third-party sources, with the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company.*** Investments listed on a recognized exchange or market quotation system, whether U.S. or foreign, are valued using the closing price on the date of valuation. Investments not listed on a recognized exchange or market quotation system, but for which reliable market quotations are readily available are valued using prices provided by a

nationally recognized pricing service or by using quotations from broker-dealers.

39.    On November 6, 2025, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2025. The press release touted the Company's alleged financial results, including its NAV. The press release further purported to reassure investors that the Company had made progress "resolving challenged credits, improving the quality of our portfolio" and that the Company had created a "more diversified, lower risk portfolio." Specifically, the press release stated as follows, in relevant part:

• ***Net asset value per share was $8.71 as of September 30, 2025,*** unchanged from June 30, 2025.

• ***Net increase in net assets from operations on a GAAP basis for the quarter ended September 30, 2025 was $24.4 million,*** or $0.29 per share, compared to a $15.9 million, or $0.19 per share, net decrease in net assets from operations for the quarter ended June 30, 2025.

*                    *                    *

"We are encouraged by the progress we have made in executing against the strategic priorities we established at the start of the year – ***resolving challenged credits, improving the quality of our portfolio***, and positioning TCPC to return to historical performance levels," said Phil Tseng, Chairman, CEO, and Co-CIO of BlackRock TCP Capital Corp. "In the third quarter, non-accruals declined to 3.5% of the portfolio's fair market value, down from 3.7% last quarter and 5.6% at the end of 2024. We have also reduced the average position size in our portfolio by making new investments in the current year with an average position size of $7.8 million compared to the average position size of $11.7 million at the end of 2024, creating a ***more diversified, lower risk portfolio.***

*                    *                    *

| | Three months ended September 30, | | | | |
| | 2025 | | | 2024 | |
| | Amount | Per Share | | Amount | Per Share |
|---|---|---|---|---|---|
| **Net investment income** | $ 27,281,273 | 0.32 | $ | 33,877,641 | 0.40 |
| Less: Purchase accounting discount amortization | 1,645,031 | 0.02 | | 3,044,864 | 0.04 |
| **Adjusted net investment income** | $ 25,636,242 | 0.30 | $ | 30,832,777 | 0.36 |
| | | | | | |
| **Net realized and unrealized gain (loss)** | $ (2,911,561) | (0.03) | $ | (12,244,681) | (0.14) |
| Less: Realized gain (loss) due to the allocation of purchase discount | 5,849,398 | 0.07 | | 2,727,500 | 0.03 |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | (7,494,429) | (0.09) | | (5,772,364) | (0.07) |
| **Adjusted net realized and unrealized gain (loss)** | $ (1,266,530) | (0.01) | $ | (9,199,817) | (0.10) |
| | | | | | |
| **Net increase (decrease) in net assets resulting from operations** | $ 24,369,712 | 0.29 | $ | 21,632,960 | 0.25 |
| Less: Purchase accounting discount amortization | 1,645,031 | 0.02 | | 3,044,864 | 0.04 |
| Less: Realized gain (loss) due to the allocation of purchase discount | 5,849,398 | 0.07 | | 2,727,500 | 0.03 |
| Less: Net change in unrealized appreciation (depreciation) due to the allocation of purchase discount | (7,494,429) | (0.09) | | (5,772,364) | (0.07) |
| **Adjusted net increase (decrease) in assets resulting from operations** | $ 24,369,712 | 0.29 | $ | 21,632,960 | 0.25 |

40.    On November 6, 2025, the Company submitted its quarterly report for the period ended September 30, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report also provided additional alleged details of the Company's per share NAV financial results, and purported to assure investors that "[a]ll investments are valued at least quarterly [] with the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company." Specifically, the quarterly report stated as follows, in relevant part:

| | | Nine Months Ended September 30, | | |
| | | 2025 | | 2024 |
|---|---|---|---|---|
| **Per Common Share** | | | | |
| Per share NAV at beginning of period | | $ 9.23 | $ | 11.90 |
| | | | | |
| Investment operations: | | | | |
| Net investment income [1] | | 1.02 | | 1.26 |
| Net realized and unrealized gain (loss) [1] | | (0.67) | | (1.75) |
| Total from investment operations | | 0.35 | | (0.49) |
| | | | | |
| Net decrease in net assets as a result of issuance of shares in connection with the Merger [2] | | — | | (0.28) |
| Repurchase of common stock | | 0.00 | | — |
| | | | | |
| Dividends to common shareholders | | (0.87) | | (1.02) |
| | | | | |
| Per share NAV at end of period | | $ 8.71 | $ | 10.11 |
| | | | | |
| Per share market price at end of period | | $ 6.20 | $ | 8.29 |
| | | | | |
| Total return based on market value [3][4] | | (18.8)% | | (19.3)% |
| Total return based on net asset value [3][5] | | 3.8% | | (6.5)% |

*        *        *

Investments are recorded at fair value in accordance with GAAP, based upon the principles and methods of valuation set forth in the policies adopted by the Valuation Designee and approved by the Board of Directors. Fair value is generally defined as the amount for which an investment would be sold in an orderly transaction between market participants at the measurement date.

***All investments are valued at least quarterly based on quotations or other affirmative pricing from independent third-party sources, with the exception of investments priced directly by the Valuation Designee which in the aggregate comprise less than 5% of the assets of the Company.*** Investments listed on a recognized exchange or market quotation system, whether U.S. or foreign, are valued using the closing price on the date of valuation. Investments not listed on a recognized exchange or market quotation system, but for which reliable market quotations are readily available are valued using prices provided by a nationally recognized pricing service or by using quotations from broker-dealers.

41.    The above statements identified in ¶¶ 30, 32-40 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) the Company's investments were not being timely and/or appropriately valued; (2) the Company's efforts at portfolio restructuring were not effectively resolving challenged credits or improving the quality of the portfolio; (3) as a result, the Company's net asset value was overstated; and (4) that, as a result of the

foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis..

### Disclosures at the End of the Class Period

42.    On January 23, 2026, after market hours, when BlackRock TCP disclosed certain fourth quarter and full year 2025 financial results, including that the Company's net asset value per share as of December 31, 2025 was, in fact in the range of $7.05 to $7.09, *19% less than reported the prior quarter* and *23.4% less than reported the prior year.* Specifically, on that date, the Company issued a press release which stated as follows, in relevant part:

**Preliminary Financial Estimates:**

We currently preliminarily estimate:

• ***The Company's net asset value per share as of December 31, 2025 to be between approximately $7.05 and $7.09, an anticipated decline of approximately 19.0% during the quarter ended December 31, 2025,*** compared to a net asset value per share of $8.71 as of September 30, 2025. This decline is primarily driven by issuer-specific developments during the quarter.

• The Company's net investment income per share to be between approximately $0.24 and $0.26 for the three months ended December 31, 2025, which includes approximately 10.9% of payment-in-kind (PIK) income.

• Debt investments on non-accrual status will represent approximately 4.0% of the Company's portfolio at fair value and approximately 9.6% at cost as of December 31, 2025, compared to 3.5% of the Company's portfolio at fair value and 7.0% at cost as of September 30, 2025.

43.    On this news, BlackRock TCP's stock price fell $0.76, or 12.97%, to close at $5.10 per share on January 26, 2026, on unusually heavy trading volume.

### CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired BlackRock TCP securities between November 6, 2024 and January 23, 2026, inclusive, and who were damaged thereby

(the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, BlackRock TCP's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of BlackRock TCP shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by BlackRock TCP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of BlackRock TCP; and

1            (c)    to what extent the members of the Class have sustained damages

2  and the proper measure of damages.

3       49.    A class action is superior to all other available methods for the fair and

4  efficient adjudication of this controversy since joinder of all members is

5  impracticable.  Furthermore, as the damages suffered by individual Class members

6  may be relatively small, the expense and burden of individual litigation makes it

7  impossible for members of the Class to individually redress the wrongs done to them.

8  There will be no difficulty in the management of this action as a class action.

9                    **UNDISCLOSED ADVERSE FACTS**

10      50.    The market for BlackRock TCP's securities was open, well-developed

11  and efficient at all relevant times.  As a result of these materially false and/or

12  misleading statements, and/or failures to disclose, BlackRock TCP's securities traded

13  at artificially inflated prices during the Class Period.  Plaintiff and other members of

14  the Class purchased or otherwise acquired BlackRock TCP's securities relying upon

15  the integrity of the market price of the Company's securities and market information

16  relating to BlackRock TCP, and have been damaged thereby.

17      51.    During the Class Period, Defendants materially misled the investing

18  public, thereby inflating the price of BlackRock TCP's securities, by publicly issuing

19  false and/or misleading statements and/or omitting to disclose material facts necessary

20  to make Defendants' statements, as set forth herein, not false and/or misleading.  The

21  statements and omissions were materially false and/or misleading because they failed

22  to disclose material adverse information and/or misrepresented the truth about

23  BlackRock TCP's business, operations, and prospects as alleged herein.

24      52.    At all relevant times, the material misrepresentations and omissions

25  particularized in this Complaint directly or proximately caused or were a substantial

26  contributing cause of the damages sustained by Plaintiff and other members of the

27  Class.  As described herein, during the Class Period, Defendants made or caused to

28  be made a series of materially false and/or misleading statements about BlackRock

TCP's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

53. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

54. During the Class Period, Plaintiff and the Class purchased BlackRock TCP's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

55. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding BlackRock TCP, their control over, and/or receipt and/or modification of BlackRock TCP's allegedly materially misleading misstatements and/or their associations with the Company which made

them privy to confidential proprietary information concerning BlackRock TCP, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

56.    The market for BlackRock TCP's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, BlackRock TCP's securities traded at artificially inflated prices during the Class Period.  On December 12, 2024 the Company's share price closed at a Class Period high of $9.54 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of BlackRock TCP's securities and market information relating to BlackRock TCP, and have been damaged thereby.

57.    During the Class Period, the artificial inflation of BlackRock TCP's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about BlackRock TCP's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of BlackRock TCP and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

58.    At all relevant times, the market for BlackRock TCP's securities was an efficient market for the following reasons, among others:

(a)    BlackRock TCP shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, BlackRock TCP filed periodic public reports with the SEC and/or the NASDAQ;

(c)    BlackRock TCP regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    BlackRock TCP was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

59.    As a result of the foregoing, the market for BlackRock TCP's securities promptly digested current information regarding BlackRock TCP from all publicly available sources and reflected such information in BlackRock TCP's share price. Under these circumstances, all purchasers of BlackRock TCP's securities during the Class Period suffered similar injury through their purchase of BlackRock TCP's securities at artificially inflated prices and a presumption of reliance applies.

60.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

1  Given the importance of the Class Period material misstatements and omissions set

2  forth above, that requirement is satisfied here.

3  <u>**NO SAFE HARBOR**</u>

4      61.    The statutory safe harbor provided for forward-looking statements under

5  certain circumstances does not apply to any of the allegedly false statements pleaded

6  in this Complaint. The statements alleged to be false and misleading herein all relate

7  to then-existing facts and conditions. In addition, to the extent certain of the

8  statements alleged to be false may be characterized as forward looking, they were not

9  identified as "forward-looking statements" when made and there were no meaningful

10  cautionary statements identifying important factors that could cause actual results to

11  differ materially from those in the purportedly forward-looking statements. In the

12  alternative, to the extent that the statutory safe harbor is determined to apply to any

13  forward-looking statements pleaded herein, Defendants are liable for those false

14  forward-looking statements because at the time each of those forward-looking

15  statements was made, the speaker had actual knowledge that the forward-looking

16  statement was materially false or misleading, and/or the forward-looking statement

17  was authorized or approved by an executive officer of BlackRock TCP who knew that

18  the statement was false when made.

19  **<u>FIRST CLAIM</u>**

20  **Violation of Section 10(b) of The Exchange Act and**

21  **Rule 10b-5 Promulgated Thereunder**

22  **<u>Against All Defendants</u>**

23      62.    Plaintiff repeats and re-alleges each and every allegation contained

24  above as if fully set forth herein.

25      63.    During the Class Period, Defendants carried out a plan, scheme and

26  course of conduct which was intended to and, throughout the Class Period, did: (i)

27  deceive the investing public, including Plaintiff and other Class members, as alleged

28  herein; and (ii) cause Plaintiff and other members of the Class to purchase BlackRock

TCP's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

64.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for BlackRock TCP's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

65.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about BlackRock TCP's financial well-being and prospects, as specified herein.

66.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BlackRock TCP's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about BlackRock TCP and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

67.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

68.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing BlackRock TCP's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

69.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of BlackRock TCP's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired BlackRock TCP's securities during the Class Period at artificially high prices and were damaged thereby.

70.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that BlackRock TCP was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their BlackRock TCP securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

71.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

1

## **SECOND CLAIM**

2

### **Violation of Section 20(a) of The Exchange Act**

3

### **Against the Individual Defendants**

4       73.    Plaintiff repeats and re-alleges each and every allegation contained

5  above as if fully set forth herein.

6       74.    Individual Defendants acted as controlling persons of BlackRock TCP

7  within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue

8  of their high-level positions and their ownership and contractual rights, participation

9  in, and/or awareness of the Company's operations and intimate knowledge of the false

10  financial statements filed by the Company with the SEC and disseminated to the

11  investing public, Individual Defendants had the power to influence and control and

12  did influence and control, directly or indirectly, the decision-making of the Company,

13  including the content and dissemination of the various statements which Plaintiff

14  contends are false and misleading. Individual Defendants were provided with or had

15  unlimited access to copies of the Company's reports, press releases, public filings,

16  and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

17  these statements were issued and had the ability to prevent the issuance of the

18  statements or cause the statements to be corrected.

19       75.    In particular, Individual Defendants had direct and supervisory

20  involvement in the day-to-day operations of the Company and, therefore, had the

21  power to control or influence the particular transactions giving rise to the securities

22  violations as alleged herein, and exercised the same.

23       76.    As set forth above, BlackRock TCP and Individual Defendants each

24  violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

25  Complaint. By virtue of their position as controlling persons, Individual Defendants

26  are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate

27  result of Defendants' wrongful conduct, Plaintiff and other members of the Class

28

suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  February 3, 2026         **GLANCY PRONGAY WOLKE & ROTTER LLP**

By: */s/ Charles H. Linehan*
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  clinehan@glancylaw.com

Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email:  rdawson@glancylaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HOLZER & HOLZER, LLC**
Corey Daniel Holzer
211 Perimeter Center Parkway
Suite 1010
Atlanta, GA 30346
Telephone: (770) 392-0090
Email: cholzer@holzerlaw.com

*Counsel for Plaintiff Cory Burnell*

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.    I, <u>Cory Burnell</u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against BlackRock TCP Capital Corp. ("TCPC" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire TCPC securities at the direction of counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired TCPC securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in TCPC securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** ___1/30/2026_____
                                    **(Date)**

<br>

DocuSigned by:

*Cory Burnell*

4603C08AF6DE455...
_____                    _____
                **(Signature)**

<br>

Cory Burnell
_____
                **(Type or Print Name)**

### SUMMARY OF PURCHASES AND SALES

Account 1

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 09/16/2025 | Purchase | 1 | $6.72 |
| 09/16/2025 | Purchase | 5,000 | $6.72 |
| 09/16/2025 | Purchase | 1,800 | $6.76 |
| 09/19/2025 | Purchase | 13,200 | $6.76 |
| 10/07/2025 | Purchase | 2,630 | $5.83 |
| 10/07/2025 | Purchase | 2,370 | $5.83 |
| 10/07/2025 | Purchase | 7,500 | $5.83 |
| 10/07/2025 | Purchase | 2,300 | $5.83 |
| 10/07/2025 | Purchase | 5,200 | $5.84 |
| 10/10/2025 | Purchase | 7,500 | $5.47 |
| 10/10/2025 | Purchase | 7,500 | $5.46 |
| 10/10/2025 | Purchase | 7,500 | $5.46 |
| 10/10/2025 | Purchase | 7,500 | $5.47 |
| 10/10/2025 | Purchase | 5,000 | $5.47 |
| 10/10/2025 | Purchase | 5,000 | $5.46 |
| 10/10/2025 | Purchase | 5,000 | $5.48 |
| 10/10/2025 | Purchase | 4,600 | $5.48 |
| 10/10/2025 | Purchase | 400 | $5.49 |
| 10/10/2025 | Purchase | 800 | $5.48 |
| 10/10/2025 | Purchase | 4,200 | $5.49 |
| 10/10/2025 | Purchase | 5,000 | $5.49 |
| 12/18/2025 | Purchase | 5,000 | $5.63 |

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 12/18/2025 | Purchase | 1,391 | $5.62 |
| 12/18/2025 | Purchase | 2,400 | $5.62 |
| 12/18/2025 | Purchase | 3,209 | $5.63 |
| 12/18/2025 | Purchase | 7,000 | $5.63 |
| 12/18/2025 | Purchase | 7,000 | $5.63 |
| 12/18/2025 | Purchase | 607 | $5.62 |
| 12/19/2025 | Purchase | 7,000 | $5.50 |
| 12/19/2025 | Purchase | 2,952 | $5.51 |
| 12/19/2025 | Purchase | 900 | $5.51 |
| 12/19/2025 | Purchase | 1,240 | $5.50 |
| 12/19/2025 | Purchase | 1,908 | $5.51 |
| 12/19/2025 | Purchase | 7,000 | $5.51 |
| 12/19/2025 | Purchase | 7,000 | $5.51 |
| 12/19/2025 | Purchase | 1,289 | $5.52 |
| 12/19/2025 | Purchase | 5,711 | $5.51 |
| 12/19/2025 | Purchase | 7,000 | $5.51 |
| 12/19/2025 | Purchase | 7,000 | $5.53 |
| 12/19/2025 | Purchase | 5,000 | $5.53 |
| 12/23/2025 | Purchase | 7,000 | $5.37 |
| 01/07/2026 | Purchase | 3,751 | $5.34 |
| 01/07/2026 | Purchase | 6,249 | $5.35 |
| 01/07/2026 | Purchase | 10,000 | $5.35 |

Docusign Envelope ID: 3D5B53D9-AB2F-4E06-9A86-E1E27D4794DB

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 01/07/2026 | Purchase | 900 | $5.35 |
| 01/07/2026 | Purchase | 900 | $5.35 |
| 01/07/2026 | Purchase | 8,200 | $5.36 |
| 01/07/2026 | Purchase | 10,000 | $5.36 |
| 01/07/2026 | Purchase | 10,000 | $5.36 |

Docusign Envelope ID: 3D5B53D9-AB2F-4E06-9A86-E1E27D4794DB

## SUMMARY OF PURCHASES AND SALES

### Account 2

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 11/03/2025 | Purchase | 710 | $5.63 |
| 11/20/2025 | Purchase | 2,199 | $5.58 |
| 11/20/2025 | Purchase | 91 | $5.59 |