GIBSON, DUNN & CRUTCHER LLP
Brian M. Lutz, SBN 255976
BLutz@gibsondunn.com
George B. Adams III, SBN 321904
GAdams@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

Colin B. Davis, SBN 273942
CDavis@gibsondunn.com
Brian Yang, SBN 328551
BYang2@gibsondunn.com
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: 949.451.3800
Facsimile: 949.451.4220

*Attorneys for Defendants*
*BlackRock TCP Capital Corp., Raj Vig,*
*Phil Tseng, and Erik L. Cuellar*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

IN RE BLACKROCK TCP CAPITAL CORP. SECURITIES LITIGATION

Case No. 2:26-cv-01102-AB-DFM

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

| | |
|---|---|
| Date: | March 5, 2027 |
| Time: | 10:00 a.m. |
| Place: | Courtroom 7B<br>First Street Courthouse<br>350 West 1st Street<br>Los Angeles, California |
| Judge: | Hon. André Birotte Jr. |
| Action Filed: | February 3, 2026 |

**NOTICE OF MOTION AND MOTION TO DISMISS**

NOTICE IS HEREBY GIVEN that on March 5, 2027, at 10:00 a.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable André Birotte Jr. of the above-entitled Court, Courtroom 7B, 350 West 1st Street, Los Angeles, California 90012, Defendants BlackRock TCP Capital Corp. ("TCPC" or the "Company"), Raj Vig, Phil Tseng, and Erik L. Cuellar (the "Individual Defendants," and together with TCPC, "Defendants") shall and hereby do move the Court for an order dismissing Lead Plaintiffs Matthew Zuliani and Thea Zuliani's ("Plaintiffs") Amended Class Action Complaint ("Complaint") (Dkt. No. 38) for failure to state a claim under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934.

This Motion is made under Federal Rules of Civil Procedure 12(b)(6) and 9(b) on the grounds that the Complaint fails adequately to plead claims consistent with the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 et seq., and fails to plead facts sufficient to allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As explained further below, the Complaint should be dismissed on multiple grounds: (i) Plaintiffs have not alleged any material misrepresentation or omission in violation of Section 10(b) of the Securities Exchange Act; (ii) there are no allegations supporting an inference of scienter, much less the required strong inference; (iii) Plaintiffs have not adequately alleged loss causation because there has been no disclosure "revealing" that any of Defendants' statements were fraudulent; and (iv) because Plaintiffs have failed to plead a primary violation of Section 10(b), the Individual Defendants cannot be subject to secondary liability as control persons under Section 20(a).

This Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the accompanying Declaration of George B. Adams and the exhibits attached thereto, Defendants' Request for Judicial Notice, all files and records in this action, oral argument, and such additional matters as may be



Gibson, Dunn & Crutcher LLP

judicially noticed by the Court or may come before the Court prior to or at the hearing on this matter.

This Motion is made following the conference of counsel required by L.R. 7-3 on October 16, 2026.

DATED: October 23, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Colin B. Davis*

Brian M. Lutz, SBN 255976
BLutz@gibsondunn.com
George B. Adams III, SBN 321904
GAdams@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 9411
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

Colin B. Davis, SBN 273942
CDavis@gibsondunn.com
Brian Yang, SBN 328551
BYang2@gibsondunn.com
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

*Attorneys for Defendants BlackRock TCP Capital Corp., Raj Vig, Phil Tseng, and Erik L. Cuellar*

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT .......... 1

II. BACKGROUND .......... 4

A. TCPC's Business. .......... 4

B. TCPC Tells Investors How It Values Loans—and Which Loans Are in Trouble. .......... 5

C. Industry-Wide Headwinds Hit Middle-Market Lenders. .......... 7

D. TCPC Pre-Announces Its Q4 2025 Results, and Plaintiffs Sue Eleven Days Later. .......... 8

III. STANDARD OF REVIEW .......... 9

IV. ARGUMENT .......... 10

A. The Complaint Fails to State a Claim Under Section 10(b) and Rule 10b-5 .......... 10

1. Plaintiffs Fail to Plead an Actionable Misstatement or Omission. .......... 10

a. Plaintiffs' Core Fraud-by-Hindsight Allegation Fails As To All Statements .......... 12

b. Plaintiffs' Other Omissions Allegations Also Fail .......... 14

c. Corporate Optimism Is Not Actionable. .......... 17

2. Plaintiffs Fail to Plead Scienter as to Any Defendant. .......... 17

a. Plaintiffs Fail to Plead a Strong Inference of Scienter. .......... 18

b. The Most Plausible Inference Is Good Faith. .......... 22

3. Plaintiffs Fail to Plead Loss Causation. .......... 22

B. The Complaint Also Fails to State a 20(a) Claim. .......... 25

V. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ..... 12

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ..... 23

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..... 12

*Camp v. Qualcomm Inc.*,
2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) ..... 24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ..... 11, 21

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..... 22

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..... 23

*In re Eargo, Inc. Sec. Litig.*,
656 F. Supp. 3d 928 (N.D. Cal. 2023) ..... 13, 21

*Eckert v. PayPal Holdings, Inc.*,
831 F. App'x 366 (9th Cir. 2020) ..... 18

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011) ..... 11

*Fialkov v. Microsoft Corp.*,
72 F. Supp. 3d 1220, 1230 (W.D. Wash. 2014) ..... 14

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ..... 19, 21

*Green v. City of Talent*,
2026 WL 1846540 (9th Cir. June 26, 2026) ..... 9

*Hansainvest Hanseatische Investment-GmbH v. Enphase Energy, Inc.*,
2026 WL 2908618 (N.D. Cal. Sept. 28, 2026) ..... 10, 17

*In re Heartland Payment Sys., Inc. Sec. Litig.*,
2009 WL 4798148 (D.N.J. Dec. 7, 2009) ..... 21

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
398 F. Supp. 3d 549 (N.D. Cal. 2019) ..... 14

Gibson, Dunn & Crutcher LLP

*Lake v. Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020)........................................10

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002)........................................18

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)........................................22

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)........................................10, 23

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022)........................................17

*In re Maxwell Techs., Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014)........................................21

*May v. KushCo Holdings, Inc.*,
2020 WL 6587533 (C.D. Cal. Sept. 25, 2020)........................................20

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008)........................................18, 23, 24

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020)........................................20, 21

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014)........................................21, 25

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
50 F. Supp. 3d 1328 (C.D. Cal. 2014)........................................25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)........................................2, 3, 10, 11

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
774 F.3d 598 (9th Cir. 2014)........................................9, 24

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010)........................................13, 23

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996)........................................25

*Peters v. Colony Credit Real Estate, Inc.*,
2021 WL 4813762 (C.D. Cal. June 7, 2021)........................................11

*Petersen v. TriplePoint Venture Growth BDC Corp.*,
2024 WL 5384678 (N.D. Cal. Aug. 7, 2024)........................................11

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
2011 WL 3501733 (N.D. Cal. Aug. 10, 2011)........................................16



Gibson, Dunn & Crutcher LLP

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .... 19

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) .... 18, 19

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .... 12, 14, 18

*S. Ferry LP #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .... 19

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) .... 20

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999), *as amended* (Aug. 4, 1999) .... 1, 19

*In re Silicon Storage Tech., Inc.*,
2006 WL 648683, at *7 (N.D. Cal. Mar. 10, 2006) .... 14

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) .... 17

*Tadros v. Celladon Corp.*,
738 F. App'x 448 (9th Cir. 2018) .... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .... 18, 22

*In re VeriSign, Inc., Derivative Litig.*,
531 F. Supp. 2d 1173 (N.D. Cal. 2007) .... 20

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018) .... 18

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) .... 13

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009) .... 9, 18, 21, 22

**Statutes**

15 U.S.C. § 78u-4(b)(1) .... 2

15 U.S.C. § 78u-4(b)(1)-(2) .... 9

15 U.S.C. § 78u-4(b)(2)(A) .... 2, 17

## I. PRELIMINARY STATEMENT[1]

The Complaint rests on a flawed theory: that when a company writes down loans in an investment portfolio, it must mean the prior valuations were inflated by undisclosed "improper accounting and valuation" practices. Under Plaintiffs' theory, a write-down followed by a stock drop is securities fraud. The law says otherwise. Congress enacted the PSLRA more than thirty years ago to end precisely this kind of "fraud by hindsight" pleading. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999), *as amended* (Aug. 4, 1999), *superseded by statute on other grounds*.

TCPC is a publicly traded business development company with a roughly $1.5 billion portfolio consisting primarily of loans to 141 middle-market companies. ¶¶ 22-23. Plaintiffs' theory is that TCPC overvalued its investments in roughly a dozen of these portfolio companies (of 141) by using "undisclosed and unfair valuation accounting methodologies," and that the Company's January 23, 2026 announcement of an "anticipated decline" in its year-end net asset value ("NAV") revealed the "truth" about its "improper" accounting. ¶¶ 3, 23, 145, 186. This theory makes no sense.

As the Company disclosed, its portfolio investments are valued quarterly by its Valuation Designee, which utilizes the services of an independent valuation firm. ¶ 53; Ex. 1 at 54-55. On January 23, 2026, TCPC filed a Form 8-K estimating a decline in its 2025 year-end NAV, "primarily driven by issuer-specific developments during the [fourth] quarter." ¶ 186; Ex. 6 at 2. The 8-K identified six borrowers that accounted for most of the anticipated decline—five of which were already known to investors as troubled, restructured, or on non-accrual status. ¶¶ 92, 94-98, 108-09, 115, 133; Ex. 6 at 2-3. Plaintiffs allege that the announcement somehow disclosed a "shift to fair accounting practices," ¶ 4, but nowhere in the 104-page Complaint do Plaintiffs identify

---

[1] Unless otherwise noted, all emphasis is added, all internal quotation marks and citations are omitted, and references to "¶__" or "¶¶ __" are to the allegations in the Amended Complaint (the "Complaint"), Dkt. No. 38, which are assumed true (if well-pleaded) for purposes of this Motion only. Defendants reserve their right to contest these allegations if the case proceeds.

any change in the Company's valuation policy or methodology. The January 23, 2026 announcement reported developments at specific borrowers—not any change to TCPC's valuation methodology.

Nothing about TCPC's "valuation accounting methodologies" was hidden. The Company told investors exactly how it valued its loans: under a documented valuation policy "reviewed and approved by our Board of Directors" and "consistently applied" by its Valuation Designee, with independent third-party valuation firms appraising more than 98% of the portfolio every quarter and only 0.1% priced by the Advisor itself without using an independent valuation firm. ¶¶ 53, 62; Ex. 1 at 2, 37, 54-55, 78-80, 127. TCPC disclosed its policies for placing troubled loans on non-accrual status and accounting for restructured loans, warned that its fair-value estimates were "inherently uncertain" and could "materially understate or overstate" what it ultimately realized, and reported the cost and fair value of every position it held. ¶¶ 80 n.8, 154; Ex. 1 at 37, 54, 79-80. It also disclosed which loans were in trouble on a quarterly basis and discussed troubled borrowers by name in the Company's quarterly filings and in earnings calls. *E.g.*, ¶¶ 65-66, 84-140.

The Complaint concedes these frequent and detailed disclosures yet alleges no facts showing that any of them were untrue or misleading when made. Instead, it alleges that TCPC's statements must have been false because *later* "public event[s]" supposedly "forced BlackRock to recognize the deterioration in the values of [its] investments." ¶ 80.

That is not fraud. The PSLRA requires Plaintiffs to allege with factual particularity which statements were misleading and why, 15 U.S.C. § 78u-4(b)(1), and to plead facts supporting a "strong inference" that the defendants perpetrated "each act or omission alleged" with scienter—intentional or reckless deceit. *Id.* § 78u-4(b)(2)(A). The Complaint comes nowhere close.

*First*, the Complaint pleads no actionable misstatement or omission. The heart of the case—the Company's reported NAV figures—consists of fair-value estimates that

are statements of opinion protected under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). The remaining challenged statements fare no better. The Complaint pleads no contemporaneous facts contradicting any of them; the information Plaintiffs claim was omitted was in fact disclosed; and allegations about a handful of the Company's 141 portfolio companies do not render misleading truthful statements about the portfolio as a whole. Plaintiffs identify no insiders, no confidential witnesses, no internal documents, no public reporting, and no restatement showing that the Company ever misreported its portfolio. They instead rely on the Company's own public disclosures, which show a pattern of prompt reporting and transparency.

*Second*, Plaintiffs plead no facts supporting a strong inference of scienter. There are no allegations that any Individual Defendant knew a challenged statement was false or intended to deceive investors, and the Complaint identifies no insider stock sales or similar evidence of motive. Plaintiffs instead rely on Defendants' roles and experience, their purported access to information, the supposed importance of the portfolio to core operations, TCPC's fee structure, and reports of government investigations. None of it suffices, separately or together. The far more compelling inference is good faith: a management team navigating an industry-wide downturn that marked down troubled loans in real time, named them publicly, relied on independent valuations for virtually the entire portfolio, and warned the market of an anticipated NAV decline.

*Third*, Plaintiffs fail to plead loss causation. Neither disclosure they label "corrective" revealed that any prior statement was false. Each reported disappointing results at a handful of borrowers the market knew were troubled—so much so that Plaintiffs allege the Company's February 27, 2025 disclosures were simultaneously fraudulent *and* corrective. ¶¶ 148, 182. Reporting disappointing results is not a revelation of fraud.

Because Plaintiffs fail to plead falsity, scienter, or loss causation with the required particularity, their Section 10(b) claim should be dismissed—and without a predicate

10(b) claim, their Section 20(a) claim fails too.

## II. BACKGROUND

### A. TCPC's Business.

TCPC is a publicly traded business development company ("BDC") regulated under the Investment Company Act of 1940 (the "1940 Act"). ¶¶ 17, 22. BDCs raise money from investors and lend it to small and midsize businesses as an alternative to bank financing. *Id.* TCPC earns returns from interest and fees on its loans and, to a lesser extent, from equity appreciation. *Id.* As of the fourth quarter of 2025, the Company's portfolio consisted of loans to 141 companies with a total fair value of approximately $1.5 billion. ¶ 23.

Under generally accepted accounting principles set by the Financial Accounting Standards Board, a BDC must report its loans at "fair value"—an estimate of what each loan would sell for in an orderly sale on the reporting date. ¶¶ 42-43. For exchange-traded assets, fair value is the market price. ¶ 43. TCPC's loans, however, are privately negotiated and have no market price, so their fair value must be estimated based on judgments about each borrower's prospects. These "Level 3" assets made up the vast majority of the Company's portfolio during the relevant period. ¶¶ 43-44.

Like most BDCs, TCPC designated an external investment advisor under Rule 2a-5 of the 1940 Act to adopt policies for valuing the Company's investments. ¶ 46. During the relevant period, that advisor was Tennenbaum Capital Partners, LLC ("Tennenbaum" or the "Advisor"), a wholly owned subsidiary of BlackRock, Inc. *Id.*

Defendant Rajneesh Vig was the Company's CEO from August 2021 through November 2024, and its Chairman of the Board from September 2021 through November 2024. ¶ 18. Defendant Philip Tseng succeeded Vig in both roles on November 6, 2024, and also served as the Company's Co-Chief Investment Officer. ¶ 19. Both were employed by the Advisor while serving in those roles. ¶ 49. Defendant Erik Cuellar was the Company's CFO and Treasurer throughout the relevant period. ¶ 20.

**B. TCPC Tells Investors How It Values Loans—and Which Loans Are in Trouble.**

TCPC reported its NAV per share every quarter. ¶ 41. NAV is the estimated value of the Company's loans and other investments, minus what it owes, divided by its shares outstanding. ¶ 26. Because most of the Company's loans are Level 3 assets, the Company's NAV per share depends on estimates made "based upon the principles and methods of valuation set forth in policies adopted by the Advisor as Valuation Designee." ¶ 46; *see generally* ¶¶ 43-45.

Plaintiffs concede that TCPC's periodic reports "described the Company's valuation techniques in detail." ¶ 201. The Company told investors that its investments were valued "using a consistently applied valuation process" under a written policy "reviewed and approved by our Board of Directors." Ex. 1 at 2, 37. And those valuations did not rest on management's say-so: the Advisor, as Valuation Designee, "utilizes the services of an independent valuation firm, which prepares valuation reports on a quarterly basis," *id.* at 54-55, and "[a]ll investments [were] valued at least quarterly based on quotations or other affirmative pricing from independent third-party sources," except for positions totaling 0.1% of the portfolio that the Advisor priced itself without using an independent valuation firm. ¶¶ 53, 62. Those independent firms "conduct[ed] independent appraisals each quarter" using market quotations, the market approach, the income approach, or, for recent investments, the cost approach. Ex. 1 at 78, 126. The Company even disclosed the discount rates it applied and how changes in those rates would affect fair value. ¶¶ 57-58.

The Company also warned investors of the very risk on which Plaintiffs' claims rest. It cautioned that "[b]ecause such valuations are inherently uncertain and may be based on estimates, our determinations of fair value may differ materially from the values that would be assessed if a readily available market for these securities existed," and that these estimates "may cause our net asset value on a given date to materially understate or overstate the value that we may ultimately realize." ¶ 154; Ex. 1 at 54. It

also warned that NAV "could be adversely affected if determinations regarding the fair value of these investments were materially higher than the values ultimately realized." *Id.* at 37-38.

The Complaint also acknowledges that the Company told investors, every quarter, exactly which loans were in trouble. When the Company concluded that a borrower would not pay what it owed, it placed the loan on "non-accrual status" and stopped counting the loan's interest as income. ¶¶ 39, 67. It reported non-accruals as a share of the portfolio at both cost and fair value. ¶ 40. It also reported the cost and current fair value of every position it held, ¶ 80 n.8, and management discussed some of the troubled borrowers by name on quarterly earnings calls, *see* ¶¶ 84-140. Its filings also explained that payment-in-kind ("PIK") interest "represents contractual interest added to the loan balance and due at the end of the loan term," and that when a loan goes on non-accrual, accrued interest "including any accrued PIK interest," is "generally reversed." Ex. 1 at 37, 79.

The Company also explained exactly how it accounted for restructured loans. First, the original loan is written off, and the Company records a realized loss equal to the difference between what it paid and what it received, "without regard to unrealized appreciation or depreciation previously recognized." Ex. 1 at 80. Second, if the loan had already been marked down in earlier quarters, those unrealized losses are reversed so the same loss is not counted twice. ¶ 38 ("When an unrealized loss is reversed, nothing is recovered."). Third, whatever the Company receives—typically a smaller loan, sometimes with equity in the borrower—is recorded at "the transaction price to acquire the [new] position" and then revalued every quarter like every other asset. Ex. 8 at 35; *see also* ¶ 73. The Company warned investors that these workouts might "result in only partial recovery of cash payments or an exchange of the defaulted obligation for other debt or equity securities of the issuer or its affiliates, which may in turn be illiquid or speculative," and that what it received might "have a lower value or income potential than may have been anticipated." Ex. 1 at 13, 52.

### C. Industry-Wide Headwinds Hit Middle-Market Lenders.

By 2024, borrowers that had taken on floating-rate debt when rates were near zero had "endured higher floating rate debt burdens over the past few years," Ex. 2 at 5, and businesses that had "benefited from high levels of pandemic era demand" saw "results [soften]." ¶ 196. TCPC was not immune: its results were "impacted by market conditions, including tighter spreads as a result of the continued slower deal environment and declining interest rates." Ex. 9 at 3. Several larger borrowers that had thrived during the pandemic—including e-commerce aggregators Razor Group, SellerX, and Thrasio, and education software company Edmentum—struggled, and the Company placed their loans on non-accrual and wrote them down. ¶¶ 84-140. By the end of 2024, twelve of the Company's borrowers were on non-accrual, representing 14.4% of the portfolio at cost, and NAV had fallen from $10.11 to $9.23 per share. ¶¶ 40, 41, 66, 147.

The Company confronted these problems head-on, working to recover as much as it could for investors. Rather than dump troubled loans at fire-sale prices, it worked with borrowers and co-lenders to restructure them, taking control of borrowers where necessary, converting debt to equity, and extending maturities to give the businesses time to recover. As management explained, "resolving credit issues quickly does not always produce the best results for shareholders," and "sometimes getting the best outcome for shareholders does require time and patience." Ex. 9 at 3; Ex. 2 at 11.

For example, TCPC and Pluralsight's other lenders took ownership of Pluralsight from its private-equity sponsor in a recapitalization that eliminated "approximately 75%" of its debt and left TCPC "holding both first-lien debt and common equity." ¶ 101. The Company disclosed a $24.1 million realized loss, reversed the unrealized loss it had previously taken, valued the new loans at the transaction price, and carried the equity it received at less than half its cost. ¶¶ 102, 106, 142. It took similar approaches with Razor, SellerX, Renovo, and others over the following year, each time reporting the realized loss and offsetting reversal and explaining that the losses "were substantially

already reflected" in the prior quarter's NAV. ¶¶ 89, 99-100, 161-62, 170-71; Ex. 10 at 5; Ex. 11 at 6.

Other lenders to the same borrowers applied the same accounting at the same time—including the very peers Plaintiffs hold up as benchmarks. Ares Capital, whose earlier Pluralsight valuation Plaintiffs cite, ¶ 104, valued its new Pluralsight loans and equity at the prices Ares paid for them in the quarter after the restructuring. Ex. 12, Sched. of Invs. And New Mountain, which Plaintiffs invoke for Edmentum, ¶¶ 110-12, valued its Edmentum notes at the full purchase price through September 30, 2025, and then wrote its position down by 46% in the fourth quarter of 2025—the same quarter TCPC did. Ex. 13, Sched. of Invs.; Ex. 14 at 116.

None of these challenges was a secret. On November 6, 2024—the first day of the Class Period—Raymond James observed that "[m]ultiple assets are going through, or have gone through, troubled restructuring or motivated M&A activity," which "can result in greater swings in valuation," and that TCPC's "credit book remains on somewhat shaky footing." Ex. 4 at 1. JPMorgan rated TCPC's stock "underweight" throughout the Class Period and described the Company as having "one of the highest non-accrual ratios among names in [its] coverage." Ex. 5 at 1. And when the Company reported its year-end 2024 results on February 27, 2025, disclosing the $50.3 million Razor markdown, twelve non-accruals, and a dividend cut, ¶¶ 95-96, 147, 149, Raymond James's headline said it all: "Earnings were weak as credit and NAV deteriorated (again)." Ex. 15 at 1. Yet Plaintiffs allege that these disclosures were somehow both false and partially corrective of earlier alleged falsehoods. ¶¶ 148, 182.

**D. TCPC Pre-Announces Its Q4 2025 Results, and Plaintiffs Sue Eleven Days Later.**

On January 23, 2026, ahead of its scheduled earnings release, the Company filed a Form 8-K estimating that year-end 2025 NAV would be between $7.05 and $7.09 per share, down from $8.71 the prior quarter, "primarily driven by issuer-specific developments during the quarter." ¶ 186; Ex. 6 at 2. The 8-K named the six borrowers

responsible for most of the decline—Edmentum, Razor, SellerX, Renovo, Hylan, and InMobi—five of which the Company had already flagged to investors as troubled, restructured, or on non-accrual status. Ex. 6 at 2-3; *see* Ex. 1 at 82; Ex. 8 at 77-78, Recent Developments, and Sched. of Invs.; ¶¶ 92, 94-98, 108-09, 115, 133. Analysts were not surprised. JPMorgan wrote that it did not "see anything on the list that suggests broad-based weakness" and was "not surprised about Edmentum." Ex. 7 at 2. Raymond James wrote that "[p]revious issue assets were indicated to be the primary driver of NAV deterioration." Ex. 16 at 1.

Just eleven days after the Company's earnings pre-release, on February 3, 2026, a shareholder filed the initial complaint in this putative class action. Dkt. No. 1.

## III. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Green v. City of Talent*, 2026 WL 1846540, at *1 (9th Cir. June 26, 2026). Although the Court must accept well-pleaded factual allegations as true, pleadings that are "no more than conclusions[] are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Rule 12(b)(6) is a baseline that all complaints must surpass to survive a motion to dismiss. Plaintiffs, however, must also overcome two far stricter standards. First, because Plaintiffs' claims allege fraud, under Rule 9(b), they must "state with particularity the circumstances constituting fraud or mistake." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Second, because Plaintiffs assert a securities fraud claim, they are also subject to "the more exacting pleading requirements of the PSLRA," which means that Plaintiffs must plead "all elements of a securities fraud action" with particularity. *Id.*; *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 604-05 (9th Cir. 2014); *see also* 15 U.S.C. § 78u-4(b)(1)-(2).

## IV. ARGUMENT

### A. The Complaint Fails to State a Claim Under Section 10(b) and Rule 10b-5.

To state a Section 10(b) claim, a complaint must allege facts sufficient to establish (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) on which Plaintiffs relied; (5) economic loss; and (6) loss causation. *Loos v. Immersion Corp.*, 762 F.3d 880, 886-87 (9th Cir. 2014), *as amended* (Sept. 11, 2014). Plaintiffs' Complaint does not do so.

#### 1. Plaintiffs Fail to Plead an Actionable Misstatement or Omission.

Plaintiffs challenge five categories of statements, also identified in Appendix A: (i) statements reporting the Company's quarterly NAV (Statements 1-5); (ii) statements regarding the accrual vs. non-accrual accounting status for specific debt investments (Statements 6-9); (iii) a statement regarding valuation risks (Statement 10); (iv) statements regarding the performance of the Company's investment portfolio, including losses and restructurings impacting specific investments (Statements 11-20); and (v) statements regarding the Company's internal portfolio risk rating (Statements 21-22). Plaintiffs' sole theory for every statement is that it was false and/or misleading because Defendants allegedly "*failed to disclose*" certain other material, adverse facts. ¶¶ 145, 151, 153, 155, 157, 162-63, 165, 172, 174, 176, 179.

Plaintiffs come nowhere close to meeting the "high bar for [pleading] a materially misleading omission[.]" *Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *9-10 (N.D. Cal. Jan. 27, 2020). The heart of the case—the Company's reported NAV figures—consists of fair-value estimates that are statements of opinion, which are not actionable because they do not "express[] certainty about a thing." *Omnicare*, 575 U.S. at 183. "A statement of opinion is one that expresses a belief, a view, or a sentiment which the mind forms of persons or things." *Hansainvest Hanseatische Investment-GmbH v. Enphase Energy, Inc.*, 2026 WL 2908618, at *4 (N.D. Cal. Sept. 28, 2026). Although opinion statements may be accompanied by phrases such as "I think" or "I believe," that language is not necessary. *Id.* at *5.

Plaintiffs challenge multiple opinion statements as misleading, including the reported NAV figures (Statements 1-5)[2] as well as the Company's "*belie[f]*" that a regular dividend of $0.25 per share was "sustainable" (Statement 12), that a markdown "did come as a *surprise* to" the Company (Statement 14), and that the Company "*estimate[d]* that only a mid-single digit percentage of our portfolio at fair market value will be directly impacted by tariffs" (Statement 16). Opinions are actionable only if: (1) the speaker does not honestly hold the stated opinion; (2) it includes an "embedded statement[] of fact" that is false; or (3) it omits facts that are necessary to make the opinion not misleading. *Omnicare*, 575 U.S. at 184-90; *accord City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). Plaintiffs do not allege that the NAV figures or other opinion statements were objectively wrong or that the Individual Defendants did not actually believe them.

Nor do Plaintiffs identify any embedded statements of fact that are false or any omissions of fact that make these opinions misleading. To the contrary, the Complaint admits that TCPC provided investors with regular and detailed reporting throughout the Class Period about the Company's accounting methodologies and policies, how investment valuations were derived and tested, the factors considered, as well as regular reporting on actual results, including realized and unrealized losses, NAV, accrual status, and other specific details regarding portfolio performance. *See, e.g.*, ¶ 40 (non-accrual status); ¶ 46 (valuation methods); ¶ 53 (valuation process); ¶¶ 57-58 (discount rates); ¶¶ 74, 89, 99, 102, 105-06 (reversal of unrealized losses associated with restructured loans). The Company's SEC filings disclosed the very accounting policy Plaintiffs challenge: that fair values "are determined using one or more methodologies

---

[2] The challenged NAV figures are statements of opinion. Level 3 fair-value estimates are not "matters of objective fact" but judgments about what an illiquid asset would fetch, *see Align*, 856 F.3d at 613 (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011)), and NAV is the sum of those judgments. ¶ 26; *see Petersen v. TriplePoint Venture Growth BDC Corp.*, 2024 WL 5384678 (N.D. Cal. Aug. 7, 2024); *Peters v. Colony Credit Real Estate, Inc.*, 2021 WL 4813762, at *6 (C.D. Cal. June 7, 2021) (loan-collateral valuation "tests themselves are subjective").

including market quotations, the market approach, income approach, or, in the case of recent investments, the cost approach, as appropriate" and that a newly acquired position's "[f]air value was determined using the transaction price to acquire the position." Ex. 1 at 127-28; Ex. 8 at 34-35. The SEC filings also disclosed that 98.3% (later 99.6%) of the portfolio was "valued based on valuations by independent third-party sources" that "conduct independent appraisals each quarter." Ex. 1 at 78-79; Ex. 8 at 73-74. And they disclosed the mechanism Plaintiffs call "re-basing": realized gains and losses are measured against "the amortized cost basis of the investment, without regard to unrealized appreciation or depreciation previously recognized," and the change in unrealized appreciation or depreciation "includ[es] the reversal of previously recorded unrealized appreciation or depreciation when gains or losses are realized." Ex. 1 at 80. Plaintiffs' own allegations—and the documents on which they rely—demonstrate transparency, not fraud.

Plaintiffs nevertheless insist that Defendants should have said more. But "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). "To be actionable under the securities laws, an omission … must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). "[A]s long as [any] omissions do not make the actual statements misleading, a company is not required to disclose" other facts "even if investors would consider the omitted information significant." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012). Here, as explained below, none of the alleged omissions identified in the Complaint render Defendants' challenged statements misleading. The Complaint thus fails to satisfy the first element of a Section 10(b) claim.

*a. Plaintiffs' Core Fraud-by-Hindsight Allegation Fails As To All Statements.*

Plaintiffs' core allegation—repeated verbatim for every one of the challenged statements—is that TCPC allegedly "cook[ed] the books" and misled investors about

the performance of its portfolio during the Class Period, ostensibly because it "*eventually* would have to make a change" as a result of which "a number of BlackRock's key loans *would lose* tremendous value." ¶¶ 145(a)-(c), 151(a)-(c), 151(f), 153(a)-(c), 155(a)-(c), 157(a)-(c), 162(a)-(c), 163(a)-(c), 165(a)-(c), 172(a)-(c), 174(a)-(c), 176(a)-(c), 179(a)-(c). This kind of catch-all, after-the-fact claim is classic fraud by hindsight. Plaintiffs plead no specific contradictory information that existed when the challenged statements were made. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 389 (9th Cir. 2010) (that a forecast was "incorrect does not retroactively make it a misrepresentation"); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (deteriorating market conditions do not retroactively falsify earlier statements).

Although Plaintiffs assert that the Company's accounting practices during the Class Period were "improper" and allegedly inflated NAV, *e.g.*, ¶¶ 3-5, 145, 151, 162, 166, 172, 179, 180, the Complaint identifies no supporting facts. What Plaintiffs plead is that valuations later dropped, allegedly following the occurrence of unnamed "public event[s]," ¶ 80, and an unspecified "shift in valuation processes," ¶¶ 5-6, 187-88. Even then, Plaintiffs plead no restatement of past financials, no admission of error, and no finding by anyone that the Company's accounting practices were improper. Notably, the analyst statement that Plaintiffs purportedly rely on for this point merely speculates that after BlackRock, Inc.'s July 2025 acquisition of HPS Investment Partners, LLC ("HPS")—a transaction to which the Company was not a party—HPS allegedly "showed up and marked NAV as they see fit," leading to "a much more conservative fair market value." ¶ 5. That is hardly an indication of fraud. Media reports of a purported government inquiry—with no reported charge, conclusion, or finding, ¶¶ 8, 237—likewise are not evidence of anything. *See In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 947 (N.D. Cal. 2023).

The absence of any facts supporting Plaintiffs' core allegation makes clear that this case is not about fraud. Plaintiffs' actual complaint is that on January 23, 2026, TCPC announced an estimated NAV decline, ¶ 186, and Plaintiffs blame this decline for

their alleged losses, ¶ 7. This is exactly the "type of [hindsight] pleading that the PSLRA was specifically enacted to eliminate." *In re Silicon Storage Tech., Inc.*, 2006 WL 648683, at *7 (N.D. Cal. Mar. 10, 2006) (rejecting "fraud by hindsight" theory that "because SST wrote down its inventory in December 2004, the statements about inventory made prior to that time must have been false because the inventory turned out not to be worth what SST had previously said it was worth."); *see also Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1230 (W.D. Wash. 2014), *aff'd*, 692 F. App'x 491 (9th Cir. 2017) ("[T]he fact that Microsoft reduced the retail price of [its product] in July 2013 does not make its positive statements about the product months earlier actionably misleading."). Plaintiffs' core, unsupported claim of improper accounting practices fails to state a claim.

*b. Plaintiffs' Other Omissions Allegations Also Fail.*

Plaintiffs' remaining omissions allegations fail as well.

*First*, Plaintiffs claim that certain statements—including the Company's statement about valuation risks (Statement 10) and some of the statements regarding the performance of the Company's investment portfolio (Statements 12, 15, 16, 18, 20)—were misleading because they allegedly omitted specific information about particular investments or risks. *See* ¶¶ 151(e), 155(d), 162(d), 163(d), 172(f), 179(f)-(i). But Plaintiffs fail to link these alleged omissions to the challenged statements, which discuss the portfolio as a whole. *See* Statements 10, 12, 15, 16, 18, 20. Contrary to Plaintiffs' allegations, Defendants were not required to say more merely because investors might "consider the omitted information significant." *Rigel Pharms.*, 697 F.3d at 880 n.8; *see also Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 398 F. Supp. 3d 549, 558 (N.D. Cal. 2019), *aff'd*, 998 F.3d 397 (9th Cir. 2021) (finding plaintiff failed to link alleged omission to generic statements).

*Second*, for Statements 6-9 (regarding the accrual vs. non-accrual accounting status for specific debt investments) and Statements 11, 15, 17, 18, and 20 (regarding the performance of the Company's investment portfolio), Plaintiffs identify allegedly

omitted information that in fact was disclosed by Defendants or otherwise publicly available. For example, Plaintiffs allege that Statement 20 touting the Company's "progress" was false and misleading because it failed to disclose (i) that one of TCPC's portfolio companies, Renovo, had filed for Chapter 7 liquidation days earlier and (ii) that the Company's Form 10-Q carried the Renovo debt "at 100% of principal and off non-accrual, as of a measurement date only thirty-four days *before* the liquidation filing." ¶¶ 179(d)-(e). All this information was available to investors. The Form 10-Q is public. *Id.* Plaintiffs also admit that Renovo's bankruptcy filing was public and that the Company addressed the Renovo liquidation in an earnings call held the same day as Statement 20, telling investors "[w]e do not expect to recover value on our investment in Renovo." ¶ 92.

At least one other alleged omission pled in connection with Statements 6, 7, and 11 likewise concerns public information and fails for this same reason. ¶ 145(f) (referencing different accounting treatment by purported peer company disclosed in that company's quarterly report, ¶ 104). The alleged omissions relating to Statements 6-9, 11, 15, and 17-18 refer to information Plaintiffs admit was disclosed on the Company's contemporaneous earnings calls or in the Company's financial statements. ¶ 162(d) (citing disclosure on the Company's earnings call in support of information allegedly omitted from press release of the same day); ¶¶ 172(d)-(e) (same); ¶ 165(d) (asserting Defendants failed to disclose that "Alpine's volumes had been declining since 2023, and the Company had been marking the position down since the third quarter of 2024," while alleging elsewhere that Tseng "described the source of [Alpine's] deterioration as dating to 2023," ¶ 124); *see also* ¶ 145(e) (citing a "reported" realized loss and "accompan[ying]" reversal of unrealized losses); ¶ 162(e) (referring to a reversal of Renovo's previously recognized unrealized losses and post-recapitalization carry value Plaintiffs elsewhere admit was "recorded" and shown on the Company's balance sheet for Q2 2025, ¶¶ 89-90). Because all of this "underlying" information "was already part of the total mix of information available to investors, [D]efendants' statements were not

misleading." *Tadros v. Celladon Corp.*, 738 F. App'x 448, 449 (9th Cir. 2018).

*Third*, some of Plaintiffs' alleged omissions are contradicted by other allegations in the Complaint. For example, Plaintiffs argue that Statements 6 and 7 (regarding the accrual vs. non-accrual accounting) and Statement 11 (regarding the performance of the investment portfolio) were misleading because they did not explain that the "improvement" in the Company's portfolio was allegedly due to Pluralsight's restructuring. ¶¶ 142-44, 145(d), 145(g). But as Plaintiffs admit, the Company *did explain* that the lender group took ownership of Pluralsight as part of its restructuring, "eliminat[ing] roughly $1.3 billion, or approximately 75%, of [Pluralsight's] funded debt" and replacing a portion of TCPC's first-lien debt with equity. ¶¶ 101-02. These changes—which significantly reduced competing debt obligations and gave the Company equity—were "signs of improvement," as the Company reported the following quarter. ¶ 143. The same is true as to Statements 12, 13, and 19. *Compare* ¶ 151(d) (alleging statement that "vast majority of our portfolio continued to perform well" was misleading because *seven* investments were "materially deteriorat[ing]"), ¶ 151(g) (alleging reference to "SellerX 'reversal[]'" was misleading without explanation that it was "not a recovery of value"), *and* ¶ 174(d) (alleging description of August 7, 2025 markdown of AutoAlert was inconsistent with the Company's stated valuation process), *with* ¶ 23 (identifying 141 portfolio companies), ¶ 38 (alleging that, under applicable accounting policies, "[w]hen an unrealized loss is reversed, nothing is recovered"), *and* ¶ 53 (under Company's valuation process, "*investments*" (not sector comparables) were "valued at least quarterly" either based on "pricing from independent third-party sources" or "directly by the Valuation Designee").

*Fourth*, Plaintiffs allege two omissions related to Statements 17 and 20 regarding the performance of the Company's investment portfolio, but do not identify any fact, much less with particularity, showing "how and why" these alleged omissions made any statement misleading at the time it was made. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2011 WL 3501733, at *12 (N.D. Cal. Aug. 10, 2011) (dismissing

complaint that failed to explain "how and why the Statements [were] misleading as opposed to just incomplete"). Plaintiffs allege that the "Company was already considering placing Alpine on non-accrual" as of May 8, 2025, ¶ 165(e), yet Plaintiffs identify no facts to support this allegation. Plaintiffs also allege that the Company's Q3 2025 investor presentation "omitted, for the first time, the weighted average internal portfolio risk rating the Company had reported every prior quarter." ¶ 179(h). But Plaintiffs allege no statement in that presentation that was allegedly misleading and offer no facts showing how investors were misled as a result.

*c. Corporate Optimism Is Not Actionable.*

Certain of the challenged statements are inactionable for an additional reason. Statements of corporate optimism are not "objectively verifiable" but, instead, are "vague, generically positive" statements that investors do not rely upon. *Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022). Plaintiffs challenge phrases like "signs of improvement" (Statement 11), "perform well" (Statement 12), "made meaningful progress" (Statement 15), "remain[ed] confident" (Statement 17), "made solid progress" (Statement 18), and "[w]e are encouraged" (Statement 20). *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (phrases like "better than expected," "robust," "well positioned," "solid," and "improved" not actionable); *see also Hansainvest*, 2026 WL 2908618, at *5-6 (holding similar statements that company was "very strong," "doing well," and had "begun to recover" inactionable). These generic statements of optimism are inactionable.

**2. Plaintiffs Fail to Plead Scienter as to Any Defendant.**

The Complaint independently fails because Plaintiffs do not come close to satisfying the PSLRA's stringent requirement for pleading scienter. The PSLRA requires that a securities complaint "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

Pleading the "required state of mind" means alleging that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991. "To meet [this] high burden for pleading scienter, a complaint cannot rely on mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021). "[U]nder this standard, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). A strong inference of scienter exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

*a. Plaintiffs Fail to Plead a Strong Inference of Scienter.*

Plaintiffs' allegations come nowhere close to pleading scienter. First, Plaintiffs fail to plead any fraudulent motive or opportunity. There are no allegations that any Defendant sold stock during the relevant period or any other allegations of an improper personal benefit whatsoever. *Webb v. SolarCity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018); *see also Eckert v. PayPal Holdings, Inc.*, 831 F. App'x 366, 367 (9th Cir. 2020) (lack of scienter "underscored by the absence of any allegation … that any defendant sold stock … or otherwise had a motive to mislead investors"). Plaintiffs' assertion that the Individual Defendants may have been motivated to inflate NAV in order to drive up potential incentive fees to the Advisor, ¶¶ 224-29, lacks support and makes no sense. As the Company disclosed, the Advisor received *no* performance-based incentive compensation during the relevant period. *See* Ex. 1 at 83; Ex. 17 at 83. In any event, allegations that individuals may have benefited from common and fully disclosed compensation structures do not suffice. *Rigel Pharms.*, 697 F.3d at 884 (compensation tied to corporate success is common and not probative of fraud); *Lipton v. Pathogenesis*

*Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) ("routine business objectives, without more, cannot normally be alleged to be motivations for fraud").

Second, Plaintiffs fail to plead any evidence of conscious misbehavior or recklessness by Defendants, as required. *Prodanova*, 993 F.3d at 1108. The Complaint identifies no witness, no whistleblower, no meeting, and no internal document or report supporting scienter. The Complaint instead relies on speculation and conclusory assertions of intentional or reckless deceit, based exclusively on generic descriptions of the Individual Defendants' roles and experience, their supposed access to information, the alleged importance of the subject matter to the Company's core operations, the fee structure for Tennenbaum, and public reports about an incomplete government investigation. ¶¶ 207-47. None of this suffices. Roles, resumes, and seniority are not particularized facts: allegations that executives "must have known" by virtue of their positions and experience, ¶¶ 219-23, are precisely the type of conclusory assertions the PSLRA forbids. *Silicon Graphics*, 183 F.3d at 985 (rejecting scienter premised on boilerplate allegations of positions and hands-on management). Allegations about participation in reporting or access to information, ¶¶ 212-18, likewise do not demonstrate knowledge of falsity or fraud. "Mere access to reports … is insufficient." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014); *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (access-based knowledge allegations do not satisfy the PSLRA).

Plaintiffs cannot rely on a "core operations" inference for this same reason. ¶¶ 230-35. The core-operations doctrine is reserved for rare circumstances requiring specific admissions of involvement in the minutiae of the underlying operations or witness accounts of actual involvement in the alleged wrongdoing. *S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 782-86 (9th Cir. 2008) (core-operations inferences are reserved for narrow circumstances); *Intuitive Surgical*, 759 F.3d at 1062-63 (requiring specific admissions or witness accounts of actual involvement). None of that is alleged here. To the contrary, Plaintiffs admit that only 0.1% of the portfolio was valued by Tennenbaum

directly (as the Company's Advisor and Valuation Designee) without using an independent valuation firm. ¶¶ 62, 230. The rest, as explained in the Company's public disclosures, were "valued at least quarterly based on quotations or other affirmative pricing from *independent third-party sources*." ¶ 53. Plaintiffs' allegations that Defendants were knowledgeable "about the investment portfolio" as a whole, "the significance of individual portfolio positions," and "each credit's operating condition"—information Plaintiffs concede also was *disclosed* to the market, ¶¶ 233-35—do not support the conclusion that Defendants knew the values assigned to the portfolio were allegedly wrong. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415-17 (9th Cir. 2020) (rejecting the core-operations theory on allegations of position and oversight).

Plaintiffs' remaining scienter theories also fail. They rest on bare assertions about what "Defendants" allegedly knew or did. *See, e.g.*, ¶¶ 236-46. Plaintiffs do not attempt to plead scienter as to each individual Defendant, as the PSLRA requires. *See May v. KushCo Holdings, Inc.*, 2020 WL 6587533, at *7 (C.D. Cal. Sept. 25, 2020) (allegations that "impermissibly group[] all of the Individual Defendants together … are insufficient to satisfy the particularized pleading required of the PSLRA"); *see also In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007).

Plaintiffs suggest that scienter is shown because Defendants allegedly took a similar approach in managing and valuing the Company's investments in six portfolio companies. ¶ 236. But Plaintiffs elsewhere admit that those six companies were just four percent of the 141 companies in the portfolio. ¶ 23. Plaintiffs offer no explanation or evidence for how alleged similarities among four percent of a portfolio constituted a "practice," ¶ 236, much less "particularized allegations demonstrating a pattern of fraud" as required to plead scienter. *See ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1260-61, 1263 (C.D. Cal. 2015) ("allegations of a pattern of fraudulent conduct [that were] conclusory and not supported by particularized facts" did not support scienter).

Similarly, media reports about a purported government inquiry—published

months after the Class Period ended—are not evidence of any Defendant's state of mind, and the Complaint's supporting material (a news report, an abstract prosecutorial sound bite, and a podcast host's speculation, ¶ 240) supplies no particularized facts supporting scienter. *Nguyen*, 962 F.3d at 418 n.3 (rejecting investigation- and departure-based scienter); *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 947-48 (N.D. Cal. 2023) (pending investigations do not demonstrate scienter); *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1043 (S.D. Cal. 2014) (investigation reveals nothing about any individual defendant's state of mind).

Tseng's departure after the Class Period, ¶ 206, and boilerplate SOX certifications also add nothing: resignations support scienter only where the pleaded facts tie the departure to the alleged fraud, and certifications support scienter only where accounting problems were glaring. *Zucco*, 552 F.3d at 1002-04 (resignations require particularized facts linking the departure to the alleged fraud); *Align*, 856 F.3d at 622 (CFO resignation coinciding with impairment charge insufficient); *Glazer*, 549 F.3d at 747 (certifications add nothing to scienter calculus absent glaring accounting irregularities).

Finally, Plaintiffs' timing argument goes nowhere. ¶¶ 242-46. Plaintiffs suggest that the proximity between the challenged statements and alleged corrective events must mean that Defendants knew of, but failed to disclose, "huge underlying quality issues with the portfolio." ¶ 244. This type of temporal argument does not establish scienter. *See Align*, 856 F.3d at 622. Plaintiffs identify no non-speculative supporting facts—much less particularized facts specific to any Defendant, as required. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056-57, 1065 (9th Cir. 2014) (plaintiff did not plausibly allege that defendants "intentionally mislead investors" or were reckless "by not disclosing [a] problem sooner"); *see also In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *8 (D.N.J. Dec. 7, 2009) (no scienter where "[t]here is nothing in the Complaint that supports an inference that these concerns were … relayed to any of the Defendants"). Although Plaintiffs insist that the write-downs announced by the Company on January 23, 2026, could not have been caused by events from the

prior quarter, ¶ 245, that allegation is unsupported by any pleaded fact and is contradicted by TCPC's own explanation: the Company's February 27, 2026 announcement and later post-Class Period statements identified new, intervening, non-fraud events—underperformance and negative developments at certain portfolio companies. *See infra* § IV.A.3.

*b. The Most Plausible Inference Is Good Faith.*

To survive a motion to dismiss, any inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Here, the far more cogent inference is that Defendants acted in good faith: a management team steering a 2021-vintage middle-market credit book through an industry-wide downturn, marking down in real time by name and amount, tripling disclosed non-accruals, cutting the Company's dividend, voluntarily filing an off-cycle Form 8-K to warn the market before final results, relying on independent third-party valuation firms for more than 98% of assets and on audited financial statements, and holding their own shares throughout. *Tellabs*, 551 U.S. at 323-24 (the fraud inference must be cogent and at least as compelling as any nonfraudulent inference); *Zucco*, 552 F.3d at 1004-05 (reliance on outside professionals cuts against scienter); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1143 (E.D. Wash. 2013) (the downturn was "the far more likely alternative inference").

**3. Plaintiffs Fail to Plead Loss Causation.**

The Complaint also must be dismissed on the independent ground that Plaintiffs fail to plead loss causation. To plead loss causation with the particularity required by Rule 9(b), a plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some other intervening event" or "other fact." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-10 (9th Cir. 2016). When a securities fraud plaintiff relies on a "revelation of the fraud" theory of loss causation, the plaintiff must plead that (1) she purchased a security at a price that was artificially

inflated by a specific alleged misstatement; (2) a "corrective disclosure" subsequently revealed the "truth" about that specific misstatement; and (3) the disclosure of the truth caused the company's stock price to decline. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43, 346-47 (2005); *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).

Here, the allegations in the Complaint show, if anything, that Plaintiffs' alleged losses were caused by intervening events—underperformance and negative developments at certain portfolio companies in the quarter—and not by the revelation of any previously concealed truth. Plaintiffs point to two announcements that they allege partially or fully revealed some previously concealed truth about supposed deficiencies in the Company's accounting practices and deterioration of the Company's portfolio. ¶¶ 182-91. Yet in both cases, the announcements that Plaintiffs identify—the Company's February 27, 2025 Form 10-K and January 23, 2026 Form 8-K—contained no restatement of past financials, no admission of error, and no revelation that any prior NAV or other reported metric was wrong when disclosed. What the Company did disclose was updated financial results for the reported period, including the rising percentage of investments on non-accrual status, declining NAV, increased realized and unrealized losses, and a reduced dividend payment. ¶¶ 183-84, 186. But loss causation requires a revelation of fraud, not disappointing financial results. *See BofI*, 977 F.3d at 790; *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014); *Metzler*, 540 F.3d at 1063-65 (disclosure must reveal the fraudulent practices, not merely negative news); *accord In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392-94 (9th Cir. 2010) (affirming summary judgment where the market reacted to Oracle's "poor financial health generally" and explaining, "[l]oss causation requires more than an earnings miss"). In other words, Plaintiffs must identify some corrective fact revealed on February 27, 2025, or January 23, 2026, that rendered Defendants' prior statements about its accounting methodologies and valuations false or misleading when made. They do not. *See BofI*, 977 F.3d at 790; *see also Metzler*, 540 F.3d at 1063 (the market must learn of and react

to the fraudulent practices themselves); *Apollo*, 774 F.3d at 608 (dismissal where it was "unclear what claims made by the Defendants were invalidated by" the disclosure).

The only supposed change that Plaintiffs allege was even "tacitly" revealed in connection with the January 23, 2026 disclosure was a supposed "shift in valuation processes" following the HPS acquisition to a purportedly "much more conservative" approach. ¶¶ 5-6, 187-88. Plaintiffs are wrong. The 8-K said nothing of the kind. It explained that the Company's "financial reporting and valuation process relies upon the expertise and experience of the Company's investment professionals, independent third-party pricing vendors and valuation firms," and that management had drawn on "resources from across BlackRock's Private Financing Solutions (PFS) platform to support portfolio data collection and information flow in collaboration with" those same third-party firms. Ex. 6 at 2. Nothing about this suggests a shift in either valuation process or methodology, and Plaintiffs plead no facts suggesting that the Company's Board-approved valuation policy changed.

Plaintiffs' post-Class Period allegations do not change this conclusion. The Company's 2025 Form 10-K merely explained that a handful of positions moved between pre-existing valuation approaches, in both directions, during 2025 for reasons "driven by considerations given to the financial performance of each portfolio company." Ex. 17 at 128; *see also* Ex. 1 at 127 (discussing different approaches and factors permitted under the Company's disclosed accounting methodology). Applying a different disclosed approach to a specific loan as that borrower's circumstances change is the methodology working as described—not a revelation that earlier valuations were false. If anything, these allegations undermine rather than support Plaintiffs' theory because they present precisely the type of intervening event—that six borrowers which the market already knew to be troubled deteriorated further—that rebuts loss causation. *See Camp v. Qualcomm Inc.*, 2020 WL 1157192, at *7 (S.D. Cal. Mar. 10, 2020); *Metzler*, 540 F.3d at 1065.

The other post-Class Period events that Plaintiffs identify, ¶¶ 192-206, further undermine Plaintiffs' theory of corrective disclosure and loss. Plaintiffs contend that the increase in unrealized losses reported for the fourth quarter of 2025 was driven by twelve portfolio companies, of which the largest by far were Edmentum, Razor, and SellerX. ¶ 194. While Plaintiffs assert that these losses could not have been driven by events within the fourth quarter alone, they identify no evidence whatsoever for this assertion. ¶ 196. Instead, the Complaint concedes that the post-Class Period disclosures in February 2026 expressly tied the losses for Edmentum to "overall underperformance *in the fourth quarter* and lower anticipated future growth," ¶ 113, and the losses for Razor and SellerX, "to underperform[ance] *during the quarter*, resulting in further reduction to their outlooks," ¶ 196. Similarly, while Plaintiffs feign incredulousness that the Company wrote off its investment in Renovo in full in Q4 2025, they acknowledge that the Company reported that this move was driven by developments occurring that quarter, ¶ 205, and admit that *Renovo filed for liquidation* midway through the quarter on November 3, 2025, ¶ 92.

**B. The Complaint Also Fails to State a 20(a) Claim.**

To plead a Section 20(a) claim, a plaintiff "must show that a primary violation was committed and that the defendant directly or indirectly controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). Because Plaintiffs fail to allege a primary violation of Section 10(b), their Section 20(a) claim also fails. *NVIDIA Corp.*, 768 F.3d at 1052. Nor can Defendant Vig be liable for any statements after he left the Company on November 6, 2024. *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1370 n.195 (C.D. Cal. 2014).

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed with prejudice.

DATED: October 23, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Colin B. Davis*

Brian M. Lutz, SBN 255976
BLutz@gibsondunn.com
George B. Adams III, SBN 321904
GAdams@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 9411
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

Colin B. Davis, SBN 273942
CDavis@gibsondunn.com
Brian Yang, SBN 328551
BYang2@gibsondunn.com
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

*Attorneys for Defendants BlackRock TCP Capital Corp., Raj Vig, Phil Tseng, and Erik L. Cuellar*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants BlackRock TCP Capital Corp., Raj Vig, Phil Tseng, and Erik L. Cuellar, certifies that this brief does not exceed 25 pages, which complies with the Standing Order for Civil Cases Assigned to Judge Birotte.

Dated: October 23, 2026

*/s/ Colin B. Davis*
Colin B. Davis